## MATTER OF MEDINA

### In Deportation Proceedings

### A-26949415

### *Decided by Board October 7, 1988*

(1) Neither the Geneva Convention Relative to the Protection of Civilian Persons in Time of War nor customary international law creates a potential remedy from deportation that can be sought by individual aliens in deportation proceedings over and above that provided by the Immigration and Nationality Act, as implemented by regulation.

(2) Neither an immigration judge nor the Board of Immigration Appeals has authority to grant extended voluntary departure, deferred action, or withholding of deportation of displaced persons to "war refugees"; that is, individuals seeking refuge outside their country of origin because of war, who do not meet the refugee definition of section 101(a)(42) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42) (1982).

CHARGE:

Order: Act of 1952—Sec. 241(a)(2) [8 U.S.C. § 1251(a)(2)]—Entered without inspection

| ON BEHALF OF RESPONDENT: | ON BEHALF OF SERVICE: |
|---|---|
| Clare Cherkasky, Esquire | David Ayala |
| Proyecto Libertad | General Attorney |
| 101 A East Jackson | |
| Harlingen, Texas 78550 | David M. Dixon |
| | Appellate Counsel |
| Carol Wolchok, Esquire | |
| American Civil Liberties Union | |
| Fund of the National Capital Area | |
| 122 Maryland Avenue, N.E. | |
| Washington, D.C. 20002 | |

BY: Milhollan, Chairman; Dunne, Morris, and Vacca, Board Members. Board Member Michael J. Heilman has abstained from consideration of this case.


On July 25, 1985, the immigration judge entered a decision that found the respondent deportable as charged, denied her applications for asylum and withholding of deportation and for relief under the Geneva Conventions of 1949, but granted her the privilege of voluntary departure. The immigration judge certified his de-

cision in this case to the Board pursuant to 8 C.F.R. §§ 3.1(c) and 242.8(a) (1985), in view of his findings regarding "unusually complex and novel questions of law." Along with the briefs of the respondent and the Immigration and Naturalization Service on certification, the American Civil Liberties Union, the Lawyer's Committee for International Human Rights, and the Department of State submitted amicus curiae briefs. The decision of the immigration judge will be affirmed in part and reversed in part.

The respondent is a 26-year-old single female, a native and citizen of El Salvador, who entered the United States without inspection in November 1980, at Hildago, Texas. She conceded the allegations contained in her Order to Show Cause, Notice of Hearing, and Warrant for Arrest of Alien (Form I-221S), which establish her deportability under section 241(a)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(2) (1982). Accordingly, her deportability is established by evidence that is clear, unequivocal, and convincing. *Woodby v. INS*, 385 U.S. 276 (1966).

At her deportation hearing, the respondent applied for asylum and withholding of deportation under sections 208(a) and 243(h) of the Act, 8 U.S.C. §§ 1158(a) and 1253(h) (1982). She also sought relief from deportation under the provisions of the Geneva Convention Relative to the Protection of Civilian Persons in Time of War ("Fourth Convention" or "Convention").[1] The respondent asserts that there exists a private right of relief under the Fourth Convention that provides relief from deportation over and above any provided for in the Act, which can be pursued in deportation proceedings. In the alternative, the respondent seeks relief based on rights she submits are provided by customary international law. She maintains that in a situation of open hostilities, such as presently exists in El Salvador, customary international law, binding on the United States and enforceable by private persons, provides relief from deportation that can be sought before an immigration judge. On these bases, the respondent has requested what amounts to extended voluntary departure until such time as the hostilities in El Salvador cease and it will be safe for her to return, or until another country grants her request for asylum. Alternatively, the respondent seeks a remand of this case for a further evidentiary hearing to determine whether El Salvador is violating the provisions of the Convention.

In his findings, the immigration judge determined that El Salvador is currently in a state of noninternational armed conflict and

---

[1] Geneva Convention No. IV, Aug. 12, 1949, 6 U.S.T. 3516, T.I.A.S. No. 3365, 75 U.N.T.S. 287 (entered into force for the United States Feb. 2, 1956).

that the respondent left El Salvador both to escape the armed conflict and to seek better employment in the United States. The immigration judge further found that El Salvador and the United States are "high contracting parties" under the Fourth Convention; that he was empowered to consider the Convention on the issue of deportability; and that the Convention was "self-executing" and provided potential relief to respondents in deportation proceedings not otherwise found in the Act. The immigration judge found, however, that the respondent had failed to sustain her burden of showing that El Salvador was in violation of the Convention and thus denied her request for relief under it.[2] For the reasons set forth below, we find that the immigration judge erred in holding that the Fourth Convention creates a basis for relief from deportation that can be advanced by a respondent in deportation proceedings before an immigration judge.

## I. *The Fourth Convention*

### (a) *Scope of Articles 1 and 3*

The Fourth Convention was the first Geneva convention to address the protection of civilians in time of war. It is limited in scope in several respects, the most significant of which is the fact that, with the single exception of Article 3, this Convention is concerned exclusively with *international* armed conflicts. Only Article 3, which is common to all four Geneva Conventions, specifically applies to conflicts of a noninternational character, such as the present conflict in El Salvador.[3]

---

[2] Prior to these findings, the immigration judge had denied the respondent's requests for asylum and withholding of deportation under sections 208(a) and 243(h) of the Act. The findings in this regard are not contested by the respondent here.

[3] The adoption of Article 3 represented a significant departure from previous conventions on the law of war, which had not applied to noninternational armed conflicts. Application of all of the provisions of the Convention to cases of noninternational conflict faced "almost universal opposition" at the Diplomatic Conference of 1949. Ultimately, more expansive provisions regarding noninternational conflicts were rejected as having no chance of being accepted by the governments, and the other articles of the Convention were not made applicable to such conflicts. *See Commentary on the Geneva Conventions of 12 August 1949: Geneva Convention Relative to the Protection of Civilian Persons in Time of War* 26–34 (O. Uhler & H. Coursier ed. 1958) (hereinafter cited as *Commentary*).

In 1977, the Protocol Additional to the Geneva Conventions of 12 August 1949 and Relating to the Protection of Victims of Non-International Armed Conflicts ("Protocol II") was negotiated at a diplomatic conference in Geneva and signed by the United States and 101 other nations. Protocol II, Dec. 12, 1977, U.N. Doc. A/32/144, Annex II, *reprinted in* 16 I.L.M. 1442 (1977). Protocol II is an expansion of the
*Continued*

Article 3 provides:

In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum, the following provisions:

(1) Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed *hors de combat* by sickness, wounds, detention, or any other cause, shall in all circumstances be treated humanely, without any adverse distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria.

To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:

(a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;

(b) taking of hostages;

(c) outrages upon personal dignity, in particular humiliating and degrading treatment;

(d) the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

(2) The wounded and sick shall be collected and cared for.

An impartial humanitarian body, such as the International Committee of the Red Cross, may offer its services to the Parties to the conflict.

The Parties to the conflict should further endeavour to bring into force, by means of special agreements, all or part of the other provisions of the present Convention.

The application of the preceding provisions shall not affect the legal status of the Parties to the conflict.

From its plain language, it is apparent that Article 3, which does not refer to the repatriation of displaced persons, applies only to *each party* to a noninternational conflict. Since it binds only the parties to the conflict (in this case the Government of El Salvador

---

basic humanitarian provisions of Common Article 3 of the 1949 Geneva Conventions with respect to noninternational armed conflicts. Protocol II was submitted by President Reagan to the Senate on January 29, 1987. The letter of transmittal of President Reagan, the text of Protocol II, and the United States' proposed reservations and understandings to the Protocol set forth in a State Department Report are reprinted in a Senate Treaty Document. S. Treaty Doc. No. 2, 100th Cong., 1st Sess. (1987). There is no provision in Protocol II that obligates the parties to "ensure respect" of it under any circumstances. A proposed understanding to this Protocol provides that the United States will "encourage" all States to whom it provides assistance to comply with the Protocol with respect to all operations conducted by their armed forces. State Department Report, *supra*, at 7; *see also* Smith, *New Protections for Victims of International Armed Conflicts: The Proposed Ratification of Protocol II by the United States*, 120 Mil. L. Rev. 59 (1988). To date, Protocol II has not been ratified by the United States Senate.

and the guerrillas), by its terms it does not apply to the United States, which the respondent does not assert is a party to the conflict. In fact, if the United States were such a party, Article 3 would not apply as the conflict would then be of an *international* character and thus would come within the scope of Article 2, which encompasses international armed conflicts between two or more "high contracting parties." Hence, Article 3 itself cannot be found to impose obligations on the United States as regards the present conflict in El Salvador.

It is instead submitted, and the immigration judge found, that Article 1 of the Convention is the vehicle for imposing legal obligations on the United States, enforceable in deportation proceedings, with respect to noninternational conflicts to which it is not a party. Article 1, one of the shortest articles of the Convention, provides:

> The High Contracting Parties undertake to respect and ensure respect for the present Convention in all circumstances.

For two separate reasons, we do not find that Articles 1 and 3 can be read together to create a basis for relief from deportation that can be asserted by a respondent *in deportation proceedings.*[4]

First, both the provisions of the Convention itself and the accompanying commentary make clear that Article 3 is a self-contained provision that constitutes the totality of the Convention as it relates to noninternational conflicts. Article 3 is like a "Convention in miniature." It "applies to non-international conflicts only, and will be the only Article applicable to them until such time as special agreement between the Parties has brought into force between them all or part of the other provisions of the Convention." *Commentary, supra* note 3, at 34.

The conclusion that Article 3 is a "Convention in miniature" (*i.e.,* the sole and entire statement of the agreement regarding noninternational conflicts) is supported by the terms of Articles 4 and 6 of the Convention. Article 6 provides that the "present Convention shall apply from the onset of any conflict ... mentioned in Article

---

[4] The immigration judge also references Articles 147 and 148 of the Convention in his analysis of whether a basis of relief from deportation arises under the Fourth Convention. Article 147, however, is a definitional provision that enumerates actions which are considered "grave breaches" of the Convention. It applies to "persons ... protected by the present Convention," who are defined in Article 4 of the Convention. *Commentary, supra* note 3, at 597. Under Article 4, "protected persons" are those affected by international conflicts as defined in Article 2 of the Convention. *Commentary, supra* note 3, at 47. Accordingly, the Articles regarding "grave breaches" (Articles 146–48) are not directly relevant here. If the respondent is to be successful, her route must be through the provisions of Article 1, as the remainder of the Articles of the Convention (with the exception of Article 3) clearly apply only to international conflicts.

2." As noninternational conflicts are not within the scope of Article 2, under the provisions of Article 6, the Convention (other than Article 3) would not apply during the course of such conflicts.[5] Moreover, Article 4, in relevant part, defines persons protected by the Convention as persons "in the hands of a party to the conflict ... of which they are not nationals." This definition of protected persons is inconsistent with a reading of the Convention (other than Article 3) to apply to noninternational conflicts. *See Commentary, supra* note 3, at 17–25, 45–51, 58–61.

Further, it is unclear what obligations, if any, Article 1 was intended to impose with respect to violations of the Convention by other States. One commentator has stated:

> The principles of good faith and *pacta sunt servanda*, which have deep historical and jurisprudential roots in international law, impose on the United States not only a duty to perform its own obligations as a party to the Conventions (the duty "to respect" in the language of Article 1), but also a duty not to encourage others to violate common Article 3. Beyond this negative duty, the fundamental obligation implies that each state must exert efforts to ensure that no violations of the applicable provisions of humanitarian law ("to ensure respect") are committed, at the very least by third parties controlled by that state.

Meron, *The Geneva Convention as Customary Law,* 81 Am. J. Int'l L. 348, 354–55 (1987) (footnote omitted).

However, the negotiating history of Article 1 suggests that the words "to ensure respect" were intended primarily to obligate States to ensure respect of the Convention by its own civilian and military authorities. *See* 2B *Final Record of the Diplomatic Conference of Geneva of 1949,* at 53; *see also supra* note 3. And, the commentary on the words "in all circumstances" in Article 1 provides:

> The words "in all circumstances" which appear in this Article, do not, of course, cover the case of civil war, as the rules to be followed in such conflicts are laid down by the Convention itself, in Article 3. The expression refers to all situations in which the Convention has to be applied, as described, for example, in Article 2. Disregarding the provisions applicable in peacetime, and Article 3 which relates only to conflicts not of an international character, the words "in all circumstances" mean that as soon as one of the conditions of application for which Article 2 provides, is present, no Contracting Party can offer any valid pretext, legal or otherwise, for not respecting the Convention in its entirety.

*Commentary, supra* note 3, at 16 (footnote omitted). Thus, within the context of the Convention itself, it is doubtful whether Article 1 was intended to impose an affirmative duty on States of the

---

[5] A proposal at the Diplomatic Conference of 1949 to add a reference to Article 3 in Article 6 was rejected. The 1958 Commentary notes: "This result appears to confirm the opinion already expressed—namely, that Article 3 is really a 'Convention in miniature' and itself contains the rules governing its application." *Commentary, supra* note 3, at 61 (footnote omitted).

nature argued by the respondent with regard to possible violations of Article 3 by other States, particularly those not under their control.

### (b) *"Self-Execution" of Article 1*

In any event, however, we cannot conclude that Article 1 of the Convention is "self-executing," as that term has been used to refer to the creation by treaty of rights that are privately enforceable by individuals in the absence of implementing legislation.[6] We agree with the Government that the language of Article 1 (*i.e.*, that parties "undertake to respect and ensure respect" for the Convention) does not evince an intent to create judicially enforceable rights in private persons. The Article addresses itself to the political rather than the judicial branch of government and uses language suggesting declarations of principle, rather than a code of privately enforceable legal rights. The language is akin to that in various provisions of the United Nations Charter long held not to be self-executing. *See Frolova* v. *Union of Soviet Socialist Republics*, 761 F.2d 370, 373-76 (7th Cir. 1985), and the cases cited therein; *see also Huynh Thi Anh* v. *Levi*, 586 F.2d 625 (6th Cir. 1978); *Dreyfus* v. *von Finck*, 534 F.2d 24, 30 (2d Cir.), *cert. denied*, 429 U.S. 835 (1976); *Hitai* v. *INS*, 343 F.2d 466, 468 (2d Cir.), *cert. denied*, 382 U.S. 816 (1965). Moreover, the nature of the requirement to "ensure respect" for the Convention raises foreign policy issues committed to the political branch of government and not delegated to the immigration judges or this Board. It is "essentially the kind of standard that is rooted in diplomacy and its incidents, rather than in conventional adjudication." *Diggs* v. *Richardson*, 555 F.2d 848, 851 (D.C. Cir. 1976).

We further note that the Convention sets forth a specific mechanism for inquiries to be instituted into alleged violations of its provisions (Article 149) and reflects that signatory states will take measures through their own laws to enforce its provisions (Articles 145 and 146). Treaties that call for implementing legislation have been found by federal courts not to be "self-executing." *See Demjanjuk* v. *Meese*, 784 F.2d 1114, 1116 (D.C. Cir. 1986); *Frolova* v. *Union of Soviet Socialist Republics, supra*, at 375-76; *United States* v. *Postal*, 589 F.2d 862, 876-77 (5th Cir.), *cert. denied*, 444 U.S. 832 (1979); *Huynh Thi Anh* v. *Levi, supra*, at 629 (Fourth Convention

---

[6] For a discussion of the various meanings that have been assigned to the term "self-executing" in the analysis of treaties, see Iwasawa, *The Doctrine of Self-Executing Treaties in the United States: A Critical Analysis*, 26 Va. J. Int'l L. 627 (1986).

not "self-executing"); *Handel v. Artukovic,* 601 F. Supp. 1421, 1425 (C.D. Cal. 1985); *Haitian Refugee Center, Inc. v. Gracey,* 600 F. Supp. 1396, 1406 (D.D.C. 1985), *aff'd on other grounds,* 809 F.2d 794 (D.C. Cir. 1987); *see also Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 809 (D.C. Cir. 1984) (Bork, J. concurring) (Fourth Convention not "self-executing"); *Bertrand v. Sava,* 684 F.2d 204, 218–19 (2d Cir. 1982).

### (c) *Absence of Legislation Creating Remedy in Deportation Proceedings; Limits on Immigration Judge Jurisdiction*

Finally, as to the Fourth Convention issue, even if one assumes that Article 1 imposes the treaty obligations on the United States asserted by the respondent regarding the present conflict in El Salvador, have laws been enacted creating the remedy the respondent seeks in deportation proceedings? Or, assuming the Convention is "self-executing," as argued, can a remedy be sought in deportation proceedings? The answer to both questions is clearly no.

First, Congress specifically considered and chose not to enact legislation to consider persons in the respondent's situation "refugees," which could have created the right to apply for relief within the context of deportation or exclusion proceedings. *Compare* S. Rep. No. 256, 96th Cong., 1st Sess. (1979) *with* H.R. Rep. 781, 96th Cong., 2d Sess., *reprinted in* 1980 U.S. Code Cong. & Ad. News 141, 160 (joint explanatory statement of the conference committee). Bills have been regularly introduced in Congress since at least 1983 to specifically grant extended voluntary departure or deferred deportation to Salvadorans. For example, see 65 *Interpeter Releases,* No. 32, Aug. 22, 1988, at 849–50. Such legislation, which to date has not been enacted, would not create a remedy within the jurisdiction of an immigration judge or the Board.

There is presently pending in Congress a "Temporary Safe Haven Act," which would establish statutory criteria to guide the Attorney General in granting "temporary safe haven" to displaced aliens present in the United States. This Act, however, as drafted, would provide in part that the "Attorney General, after consultation with appropriate agencies of Government," may designate countries where there is an ongoing conflict that would pose a substantial threat to the personal safety of aliens if returned to that country. Aliens from such countries would be permitted to remain temporarily in the United States and not be deported. The Act would specifically provide that there be "no judicial review of any determination by the Attorney General under its [provisions]." *See* H.R. Rep. No. 4379, 100th Cong., 2d Sess. (1988) ("Temporary Safe

Haven Act of 1988"). Both Congress and the courts have recognized that determinations in this area involve considerations of both foreign and domestic policy. *See Hotel & Restaurant Employees Union v. Attorney General,* 804 F.2d 1256, 1270-72 (D.C. Cir. 1986). Thus, Congress has not enacted (and pending legislation would not create) the individual remedy *in deportation proceedings* that is sought by the respondent.

Secondly, and most fundamentally, to the extent there is authority under existing law (statutory or treaty) to grant extended voluntary departure, such authority has not been been delegated by the Attorney General to the immigration judges or this Board.[7] Immigration judges have the statutory authority to "determine the deportability of an alien" under section 242(b) of the Act, 8 U.S.C. § 1252(b) (1982). Any other "determinations" can only be made "as authorized by the Attorney General." *See* section 242(b) of the Act. Whether characterized as "extended voluntary departure," "deferred action," or the "temporary withholding of deportation of displaced persons" (not within the scope of section 243(h) of the Act), such authority has not been delegated by the Attorney General to immigration judges or this Board. *Matter of Quintero,* 18 I&N Dec. 348 (BIA 1982), *aff'd, Quintero-Martinez v. INS,* 745 F.2d 67 (9th Cir. 1984); *Matter of Banaria,* 16 I&N Dec. 421 (BIA 1977); *Matter of Anaya,* 14 I&N Dec. 488 (BIA 1973), *aff'd, Anaya-Perchez v. INS,* 500 F.2d 574 (5th Cir. 1974); *Matter of Chamizo,* 13 I&N Dec. 435 (BIA 1969); *see also* section 103(a) of the Act, 8 U.S.C. § 1103(a) (1982); 8 C.F.R. § 2.1 (1988). Accordingly, we do not find that the Fourth Convention creates a remedy that individual aliens can pursue in deportation proceedings before an immigration judge.

---

[7] Through the years, the Attorney General, ordinarily with the advice of the Secretary of State, has exercised prosecutorial discretion to temporarily suspend deportation proceedings against nationals of various, usually war-torn countries (*e.g.,* Uganda, Ethiopia, Poland, Afghanistan). The Attorney General has declined to take such action regarding Salvadorans. *See* 63 *Interpreter Releases,* No. 29, July 28, 1986, at 626-27. The authority to grant this blanket relief has not been delegated to Service district directors. *See* INS Wire, File 242.1-P (Feb. 6, 1984), reported in 61 *Interpreter Releases,* No. 6, Feb. 10, 1984, at 103-104; *see also* Commissioner's Letter, File CO 207-C (Aug. 13, 1985), reported in 62 *Interpreter Releases,* No. 37, Sept. 20, 1985, at 920.

## II. *Customary International Law*

### (a) *General*

The respondent alternatively argues that over and above any treaty obligations under the Fourth Convention, customary international law prohibits States from forceably repatriating war refugees. "War refugees" in this context are individuals who do not meet the refugee definition of the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees,[8] or of section 101(a)(42) of the Act, 8 U.S.C. § 1101(a)(42) (1982). They are displaced persons who flee areas of armed conflict, but not "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group or political opinion." Section 101(a)(42) of the Act. The reality is that displaced persons, who have "been forced to seek refuge outside their country of origin because of war or other political or social disturbances . . . now constitute the majority of the world's refugees," outnumbering the so-called "statutory refugees." *Report of the United Nations High Commissioner for Refugees,* 39 U.N. GAOR Supp. (No. 12), U.N. Doc. A/39/12 at 5 (1984).

International law is part of the law of the United States. The Supreme Court long ago held:

> International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination. For this purpose, where there is no treaty and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators who by years of labor, research, and experience have made themselves peculiarly well acquainted with the subjects of which they treat.

*The Paquete Habana,* 175 U.S. 677, 700 (1900). The Court has further held that customary international law must be referred to "in appropriate circumstances." *Banco Nacional de Cuba* v. *Sabbatino,* 376 U.S. 398, 423 (1964).

Three questions are raised regarding this issue. First, does customary international law support the premise advanced by the respondent? Secondly, are there controlling legislative or executive acts? Finally, in any event, can customary international law provide the remedy sought by the respondent in deportation proceedings?

---

[8] United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150; United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6226, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

(b) *Absence of Rule of Customary International Law*

The traditional elements for determining whether a rule of customary international law has emerged have been compressed into two: (1) a general and consistent State practice, and (2) a conception that the practice is required by, or consistent with, prevailing international law. *See North Sea Continental Shelf Cases* (FRG/Den.; FRG/Neth.), 1969 ICJ Rep. 3, 41–44 (Judgment of Feb. 20); Kirgis, *Custom on a Sliding Scale*, 81 Am. J. Int'l L. 146 (1987). Regarding the first element, there has been a growing humanitarian policy of States permitting persons fleeing from civil strife, famine, and other adverse conditions to remain in their territory temporarily. However, we must agree with the position of the Department of State that the respondent has failed to demonstrate that, where States have granted such temporary refuge, they have done so based on a conception that they were required to do so under international law. Particularly in view of the ancient, customary principle of the right of sovereign nations to determine which aliens shall be admitted and permitted to remain within their territories and the absence of any successful attempt by international treaty to include displaced persons within the protection of the laws relating to refugees, we cannot find adequate support for the concept that these humanitarian policies followed by States have emerged into a requirement of customary international law.[9]

As the existing international laws regarding refugees (which principally focus on individual claims) do not cover those who have become the "majority of the world's refugees," the pronouncements of the United Nations High Commissioner for Refugees ("UNHCR") and international organizations and groups of experts cited by the respondent regarding this matter are understandable. This is particularly true in the case of the UNHCR, whose mission is to take care of the special problems of refugees and displaced persons and to propose solutions to those problems. However, even the qualified and hortatory language used by the UNHCR suggests that the putative right of temporary refuge is a humanitarian goal, which the High Commissioner hopes will become the practice of States, rather than a present obligation of customary international law. *See, e.g.,* Report of the United Nations Commissioner for Refugees to the Economic and Social Council, U.N. Doc. E/1985/62 para. 16 (1985); Report of the United Nations High Commissioner

---

[9] Precedents "have long established the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell,* 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v. United States,* 345 U.S. 206, 210 (1953)).

for Refugees, 19 U.N. GAOR Supp. (No. 12), U.N. Doc. A/39/12 at 7 (1984).

One manner in which to frame this question regarding customary international law is to ask: If an international diplomatic conference were convened today to address the question of whether displaced persons should now be included within the definition of "statutory refugees" under the 1951 Convention and 1967 Protocol, would present State practice and "opinio juris" lead one to conclude that the States' response would not only be "yes," but would acknowledge that such is already the state of customary international law? The arguments presented to the Board do not adequately indicate that the answer to this question is "yes."

### (c) Controlling Legislative and Executive Actions

In any event, as noted above, resort is had to the "customs and usages of civilized nations," only "where there is no treaty and no controlling executive or legislative act or judicial decision." *The Paquete Habana, supra,* at 700. We find that the Immigration and Nationality Act, as amended, and the implementing regulations thereunder, are in fact controlling legislative and executive acts.

It is clear that in passing the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, Congress intended to establish a single, comprehensive basis for meeting the United States' humanitarian obligations regarding refugees. As stated in section 101(b) of the Refugee Act:

> (b) The objectives of this Act are to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States, and provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted.

The Senate Report to the Senate version of the bill states:

> The Refugee Act of 1979 establishes for the first time a comprehensive United States refugee resettlement and assistance policy. It reflects one of the oldest themes in America's history—welcoming homeless refugees to our shores. It gives statutory meaning to our national commitment to human rights and humanitarian concerns . . . And it places into law what we do for refugees now by custom and on an ad hoc basis.

S. Rep. No. 256, 96th Cong., 1st Sess. 1 (1979). The Report describes the bill as designed to meet "emergency refugee situations and any other situations of special concern to the United States." *Id.* at 2.

Further, whether to include war refugees (displaced persons) within the scope of the Act was specifically considered by Congress in the legislative process and was decided against. The Conference Committee Report states:

> The Senate bill incorporated the internationally-accepted definition of refugee contained in the U.N. Convention and Protocol Relating to the Status of Refugees. It also covered persons who are in their own country displaced by military or civil disturbances or who are uprooted by arbitrary detention and unable to return to their usual place of abode.
>
> The House amendment incorporated the U.N. definition as well as Presidentially-specified persons within their own country who are being persecuted or who fear persecution. The House amendment specifically excluded from the definition persons who themselves have engaged in persecution.
>
> The Conference substitutes the House provision.

Conf. Rep. No. 590, 96th Cong., 2d Sess. 19 (1980).

Thus, we find that the Immigration and Nationality Act, as amended by the Refugee Act of 1980, is a "controlling . . . legislative Act" that would preclude the application of customary international law in the manner urged by the respondent.

### (d) *Limits on Immigration Judge Jurisdiction*

Finally, and again most fundamentally, even if it were assumed that customary international law could provide a basis for individual aliens to assert a right that their deportation be withheld, as noted above, an immigration judge's authority is limited by statute and regulation. The authority to consider such requests has not been delegated by the Attorney General to the immigration judges or this Board.

In an amicus curiae reply brief, the Lawyers Committee for International Human Rights submits that the remedy sought by the respondent falls within the immigration judge's authority to make determinations regarding voluntary departure. It is stated that in granting voluntary departure an immigration judge "is limited only by the grant of power given to him by the statute, and the dictates of the Constitution." However, this incorrectly ignores the fact that an immigration judge's authority to grant relief from deportation is limited to that specifically delegated to him or her by the Attorney General. *See* sections 103(a) and 242(b) of the Act. An immigration judge's authority to grant a respondent voluntary departure is conditioned upon a finding that the respondent is "*willing* and has the immediate means with which to *depart promptly* from the United States." *See* 8 C.F.R. § 244.1 (1988) (emphasis added).

As indicated in *Matter of Quintero, supra,* "voluntary departure" and "extended voluntary departure" are fundamentally different forms of relief. The determination of eligibility for voluntary departure to be granted an alien by an immigration judge is premised on the respondent being able and willing to promptly depart the

United States. It is within this context that an immigration judge determines the reasonable amount of time necessary to allow the alien to readily and conveniently leave this country. *See Matter of Ocampo-Ocampo,* 13 I&N Dec. 707 (BIA 1971). On the other hand, a grant of extended voluntary departure presupposes that an alien is unwilling or unable to promptly depart. It is designed to allow an alien to remain in the United States for an indefinite period of time, such as is sought here. The authority to grant such relief has not been delegated to immigration judges. *See Matter of Quintero, supra; Matter of Banaria, supra; Matter of Anaya, supra; Matter of Chamizo, supra.* For a discussion of the difference between extensions of voluntary departure and extended voluntary departure, see 61 *Interpreter Releases,* No. 6, Feb. 10, 1984, at 103–04. Here, the respondent has been granted voluntary departure. Thus, she already has been granted the form of relief over which the immigration judge has jurisdiction.

## III. *Findings and Orders*

We find that neither the Fourth Convention nor customary international law provides potential relief from deportation that can be sought by individual aliens in deportation proceedings over and above that which is provided by the Immigration and Nationality Act, as implemented by regulation. Accordingly, the respondent's alternative request that the case be remanded for further fact-finding on whether violations of the Fourth Convention or customary international law are occurring in El Salvador is denied.

Further, although the respondent has raised no issue regarding the immigration judge's denial of her applications for asylum and withholding of deportation, we have reviewed the record in its entirety, including the respondent's testimony. The decision of the immigration judge in this regard will be affirmed as we find that the respondent failed to establish either a clear probability or a well-founded fear of persecution based on political opinion or her membership in a particular social group. *INS* v. *Cardoza-Fonseca,* 480 U.S. 421 (1987); *INS* v. *Stevic,* 467 U.S. 407 (1984); *Matter of Mogharrabi,* 19 I&N Dec. 439 (BIA 1987).

In view of the foregoing, we shall affirm the decision of the immigration judge insofar as it finds the respondent deportable as charged, denies her applications for asylum and withholding of deportation, and grants her the privilege of voluntary departure. However, we reverse the immigration judge's finding that the Geneva Convention provides jurisdiction for the immigration judge to grant to a respondent relief in deportation proceedings over and

above any relief available under the provisions of the Act, as implemented by regulation.

We finally note, however, that the respondent and those in her situation are not without avenues to the relief sought. In fact, the available approaches have been pursued. Extended voluntary departure for Salvadorans has been sought before the Attorney General and Congress. To date, however, such attempts have not been successful.

**ORDER:** The decision of the immigration judge finding the respondent deportable as charged, denying her requests for asylum and withholding of deportation, and granting her the privilege of voluntary departure is affirmed.

**FURTHER ORDER:** The decision of the immigration is reversed to the extent it finds that the Fourth Convention provides a potential basis for relief from deportation within the jurisdiction of the immigration judge.

**FURTHER ORDER:** Pursuant to the immigration judge's order and in accordance with our decision in *Matter of Chouliaris,* 16 I&N Dec. 168 (BIA 1977), the respondent is permitted to depart from the United States voluntarily within 30 days from the date of this order or any extension beyond that time as may be granted by the district director; and in the event of failure to so depart, the respondent shall be deported as provided in the immigration judge's order.