# Matter of G-K-, Respondent

*Decided January 30, 2013*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1)  The United Nations Convention Against Transnational Organized Crime, Nov. 15, 2000, 2225 U.N.T.S. 209 ("UNTOC"), which is intended to help protect witnesses of transnational organized crime from retaliation and intimidation, does not provide an independent basis for relief from removal in immigration proceedings.

(2) The objectives of the UNTOC are advanced in the United States through existing immigration laws and regulations, including the S, T, and U nonimmigrant visas and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46. 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988).

(3)  The Board of Immigration Appeals and the Immigration Judges do not have the authority to rule on the constitutionality of the statutes they administer and therefore lack jurisdiction to address a claim that the statute barring relief for particularly serious crimes is void for vagueness.

FOR RESPONDENT:  Matthew L. Hoppock, Esquire, Kansas City, Missouri

BEFORE:  Board Panel:  GRANT, MALPHRUS, and MULLANE, Board Members.

GRANT, Board Member:

In a decision dated October 4, 2011, an Immigration Judge found the respondent removable under sections 237(a)(2)(A)(iii) and (B)(i) of the Immigration and Nationality Act, 8 U.S.C. §§ 1227(a)(2)(A)(iii) and (B)(i) (2006), as an alien convicted of an aggravated felony and a controlled substance violation.  The Immigration Judge denied the respondent's applications for asylum, withholding of removal under section 241(b)(3)(A) of the Act, 8 U.S.C. § 1231(b)(3)(A) (2006), and protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46. 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture").  The Immigration Judge also

found that she lacked jurisdiction to adjudicate the respondent's claim that he should be allowed to remain in the United States pursuant to the United Nations Convention Against Transnational Organized Crime, Nov. 15, 2000, 2225 U.N.T.S. 209, http://www.unodc.org/unodc/en/treaties/CTOC/index.html ("UNTOC"). The respondent has appealed from the Immigration Judge's decision. The appeal will be dismissed.

## I. FACTUAL AND PROCEDURAL HISTORY

The respondent is a native and citizen of Ghana whose status was adjusted to that of a lawful permanent resident on January 15, 2000. On May 11, 2010, he was convicted of conspiracy to distribute and possess with intent to distribute at least a kilogram of heroin in violation of 21 U.S.C. §§ 841(b)(1)(A)(i) and 846 (2006).

The respondent was subsequently placed in removal proceedings. He requested relief from removal based on his claim that he faces harm upon his return to Ghana because he cooperated with United States authorities by agreeing to testify against his coconspirators, one of whom was reportedly a member of the Ghanaian Parliament at the time of his 2006 arrest. Both coconspirators were convicted and sentenced for their involvement in a heroin trafficking scheme. One has since returned to Ghana, while the other is still serving his 10-year prison sentence in the United States.

The respondent claimed that his role in the Parliament member's prosecution in the United States is known to the Ghanaian community in the United States and in Ghana. According to the respondent, he received two threatening phone calls and numerous "hang-up calls" in 2005 and heard from a neighbor and two friends that individuals described as "Ghanaians" or "Africans" were inquiring about him in 2005 and 2006. The respondent further testified that his family members in Ghana were approached by strangers asking about his whereabouts. He also stated that in 2009 his nephew in Ghana was severely beaten by a group of men. Further, the respondent's United States citizen wife testified to receiving phone calls that caused her concern. After the respondent was placed in the custody of the Department of Homeland Security ("DHS"), she received phone calls from individuals who were looking for the respondent, twice in 2010 and once in 2011. Another call in 2010 was from a woman who offered to assist the respondent with his immigration problems.

The Immigration Judge denied the respondent's requests for relief from removal and ordered him removed to Ghana. Specifically, she found that she had no authority to craft or adjudicate an independent remedy under the UNTOC; that the respondent was statutorily barred from asylum and withholding of removal under the Act; and that the respondent, while credible,

did not satisfy his burden of proof for protection under the Convention Against Torture. The respondent argues on appeal that the Immigration Judge erred in denying him relief under the UNTOC, withholding of removal under the Act, and protection under the Convention Against Torture. We disagree.

## II. ANALYSIS

### A. United Nations Convention Against Transnational Organized Crime and the Protocols

The respondent claims that he is entitled to remain in the United States pursuant to the UNTOC because he cooperated and agreed to testify against his coconspirators regarding their heroin trafficking scheme, in which he also took part. In making this argument, he relies on the decision of the United States Court of Appeals for the Third Circuit in *Rranci v. U.S. Attorney General*, 540 F.3d 165 (3d Cir. 2008). However, the Third Circuit did not hold that the UNTOC independently provided aliens relief that can be pursued in removal proceedings. Rather, the court remanded the case to the Board to determine how United States law complies with the relevant provisions of the UNTOC. *Id.* at 178.

The UNTOC and two supplementary protocols were signed by the United States on December 13, 2000, and were ratified on November 3, 2005. Protocol Against the Smuggling of Migrants by Land, Sea and Air, 2241 U.N.T.S. 507 (entered into force Jan. 28, 2004) ("Smuggling Protocol"); Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, 2237 U.N.T.S. 319 (entered into force Dec. 25, 2003) ("Trafficking Protocol").[1] The stated purpose of the treaty "is to promote cooperation to prevent and combat transnational organized crime effectively." UNTOC art. 1. The UNTOC and the Protocols obligate each signatory to "take appropriate measures within its means to provide effective protection from potential retaliation or intimidation for witnesses in criminal proceedings who give testimony concerning offences covered by [the UNTOC]." UNTOC art. 24(1). Individuals covered by the UNTOC and the Protocols include smuggled migrants, trafficking victims, and witnesses in criminal proceedings who give testimony concerning criminal offenses covered by the UNTOC.

As noted by the Third Circuit in *Rranci*, 540 F.3d at 178, a 2004 letter of transmittal from President George W. Bush to the Senate stated that current United States law already complies with the UNTOC, obviating the need for

---

[1] A third Protocol, which was adopted on May 31, 2001, and entered into force on July 3, 2005, relates to the illicit manufacturing of and trafficking in firearms.

any implementing legislation.  In an accompanying letter of submittal to the President, Secretary of State Colin Powell indicated that Article 24 of the UNTOC, which accords protection to witnesses in criminal proceedings, can be implemented through current criminal statutes and regulations governing the protection of witnesses, a process over which neither the Immigration Judge nor the Board has jurisdiction.  *See* S. Treaty Doc. No. 108-16 (2004), http://www.gpo.gov/fdsys/pkg/CDOC-108tdoc16/content-detail.html.[2]

In the context of immigration law, the objectives of the UNTOC concerning the protection of witnesses and trafficking victims are advanced through existing statutes.  *See, e.g.*, William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044; Trafficking Victims Protection Reauthorization Act of 2005, Pub. L. No. 109-164, 119 Stat. 3558; Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, 117 Stat. 2875; Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464 ("VTVPA"); *see also Hearing on Law Enforcement Treaties Before the S. Comm. on Foreign Relations*, 108th Cong. 9-12 (2004) (statement of Samuel M. Witten, Deputy Legal Adviser, U.S. Dep't of State).  More specifically, the immigration laws and regulations offer certain aliens who are victims of—and cooperators, informants, or witnesses against—human trafficking or a criminal organization eligibility for S, T, or U nonimmigrant status, if they satisfy other eligibility requirements and obtain the approval of the DHS.  Sections 101(a)(15)(S), (T), (U) of the Act, 8 U.S.C. §§ 1101(a)(15)(S), (T), (U) (2006); *see also, e.g.*, 8 C.F.R. §§ 214.2(t), 214.11, 214.14, 1214.2 (2012).

The S nonimmigrant classification for aliens who cooperate in criminal investigations was created by the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 130003, 108 Stat. 1796, 2024.  This classification, which is the most applicable to the respondent's case, may be available to an alien who is in possession of critical reliable information

---

[2] The President's transmittal letter included statements of reservations and understandings regarding ratification, which are detailed in the submittal letter to the President from the Secretary of State.  For example, the submittal letter states that Federal criminal law "serves as the principal legal regime within the United States for combating organized crime, and is broadly effective for this purpose," but it also noted that, based on principles of federalism, both Federal and State laws must be taken into consideration in complying with treaty obligations.  *See* S. Treaty Doc. 108-16, at 7.  Further, the submittal letter notes that two articles of the UNTOC, which concern extradition for criminal offenses and mutual legal assistance between nations in investigations and prosecutions, "would be considered self-executing in the context of normal bilateral extradition practice."  *Id*. at 18.  However, these provisions of the UNTOC are not relevant to the issues in this case.

necessary to the successful investigation or prosecution of an individual involved in a criminal organization or enterprise and who is willing to supply or has supplied such information. Section 101(a)(15)(S)(i) of the Act.[3]

An application for an S nonimmigrant visa is initiated with a request from an interested Federal or State law enforcement authority and is subject to the approval of the DHS, although the DHS's decision to deny an S visa is referred to the Deputy Attorney General for a final resolution in certain circumstances. *See* 8 C.F.R. §§ 214.2(t)(4), (5). The Board does not have jurisdiction over S visas. The respondent could potentially be covered by the UNTOC provisions through his cooperation with the United States in its prosecution of his coconspirators in a transnational organized drug-trafficking crime. *See* UNTOC, arts. 5, 24. However, he does not claim that a visa application has been filed on his behalf by an interested Federal or State law enforcement authority. *See* 8 C.F.R. §§ 214.2(t)(1), (4).

The Act was also amended in 2000 to create the T nonimmigrant classification for victims of severe forms of trafficking who would "suffer extreme hardship involving unusual and severe harm upon removal" and who, inter alia, have complied with any reasonable request for assistance in the investigation or prosecution of acts of such trafficking in persons. Section 101(a)(15)(T)(i)(IV) of the Act; *see also* VTVPA § 107(e)(1), 114 Stat. at 1477; 8 C.F.R. §§ 212.16, 214.11, 1212.16, 1214.2 (2012). Determinations regarding eligibility for T nonimmigrant status are within the sole jurisdiction and discretion of the DHS. *See, e.g.*, 8 C.F.R. §§ 212.16, 214.11. The regulations do permit Immigration Judges or the Board to administratively close or indefinitely continue pending removal proceedings to allow an alien to pursue an application for T nonimmigrant status with the DHS. 8 C.F.R. § 214.11(d)(8). However, the respondent was not a victim of human trafficking, and he does not claim that he has applied for this visa.

In 2000, Congress also created the U classification, which is available to an alien who suffered substantial physical or mental abuse as a result of having been a victim of certain criminal activity and who possesses information concerning such activity. Section 101(a)(15)(U) of the Act; *see also* VTVPA § 1513(b), 114 Stat. at 1534. The purpose of the statute was to strengthen the ability of law enforcement to detect, investigate, and prosecute certain crimes, while offering protection to the victims of such offenses. *Matter of Sanchez Sosa*, 25 I&N Dec. 807, 809 (BIA 2012). Congress intended to encourage aliens who are victims of significant criminal activity to cooperate with law enforcement in the investigation and prosecution of the offenders. *Id.*

---

[3] The S visa is also available to an alien who is willing or has supplied critical reliable information concerning a terrorist organization and who will be or has been placed in danger as a result of providing such information. Section 101(a)(15)(S)(ii) of the Act.

Exclusive jurisdiction over U nonimmigrant visa petitions rests with the DHS, but an alien may seek a continuance in immigration proceedings to await the visa process. *Id.* at 811-12. The respondent has not claimed or shown that he is eligible for U nonimmigrant status, nor has he requested a continuance to apply for this visa.

The United States may also comply with the provisions of the UNTOC through the regulations relating to withholding or deferral of removal under the Convention Against Torture, a form of protection over which Immigration Judges have jurisdiction, and which they have authority to grant. Relief from removal under the Convention Against Torture is mandatory and is available to an alien who has established that it is more likely than not that he or she would be tortured if removed to the country of removal by or at the instigation of, or with the consent and acquiescence of, a public official acting in an official capacity. 8 C.F.R. §§ 1208.16–1208.18 (2012). While protection under the Convention Against Torture is not coextensive with the provisions of the UNTOC, there may be instances where the possibility of torture makes such relief available.

Contrary to the respondent's assertion on appeal, neither the Third Circuit's decision in *Rranci* nor the UNTOC provide for the Board or the Immigration Judge to adjudicate and grant relief to aliens such as the respondent in order to fulfill the United States' obligations under the treaty. Nothing in the UNTOC, either explicitly or implicitly, gives us authority to grant the respondent permission to remain in the United States or prevent his removal to Ghana because he was a cooperating witness in a criminal case in this country. Nor does the treaty, which has broad, aspirational language, provide any parameters as to what specific type of relief or protection would be afforded. It is well established that the Board has no authority to create relief beyond what has been provided by the Act or the regulations, because the jurisdiction of the Board and the Immigration Judge is limited by statute and regulation to that which has been delegated by the Attorney General. *See Matter of H-M-V-*, 22 I&N Dec. 256, 258 (BIA 1998); *Matter of Medina*, 19 I&N Dec. 734, 742, 746-47 (BIA 1988). *See generally, e.g.*, *Hui Zheng v. Holder*, 562 F.3d 647, 655-56 (4th Cir. 2009) (stating that treaty obligations are effectuated through a statutory scheme that Congress has established and that the Attorney General has implemented through regulations); *Bradvica v. INS*, 128 F.3d 1009, 1014 (7th Cir. 1997) (deferring to the holding in *Matter of Medina* that the Board's jurisdiction is limited only to what has been specifically delegated by the Attorney General).

Even assuming that the respondent has adequately demonstrated that his actions and cooperation with Federal prosecutors are necessarily covered by the UNTOC, the relevant provisions in the treaty do not create an independent basis for relief from removal that can be advanced in immigration proceedings.

Generally, a treaty does not have the force of law until the United States has enacted legislation implementing it or, if legislation is not necessary, promulgated regulations that implement it. *See Medellin v. Texas*, 552 U.S. 491, 505 (2008) (noting that while treaties may comprise international commitments, they are not domestic law unless Congress has enacted implementing statutes); *see also Matter of H-M-V-*, 22 I&N Dec. at 258-60 (holding that the Board lacked jurisdiction to adjudicate a claim for relief from deportation pursuant to Article 3 of the Convention Against Torture because no specific legislation or regulation implemented its provisions and Article 3 is not a self-executing treaty provision).[4]

A treaty may, in specific circumstances, be deemed to be "self-executing" and have automatic domestic effect as Federal law, but only when the treaty itself conveys such an intention and is ratified on those terms. *Medellin v. Texas*, 552 U.S. at 505-06 & n.2. Moreover, even if a treaty is self-executing, "there is a strong presumption against inferring individual rights from international treaties." *Yuen Jin v. Mukasey*, 538 F.3d 143, 159 (2d Cir. 2008) (quoting *United States v. De La Pava*, 268 F.3d 157, 164 (2d Cir. 2001) (internal quotation marks omitted); *see also Medellin v. Texas*, 552 U.S. at 506 n.3 ("Even when treaties are self-executing in the sense that they create federal law, the background presumption is that '[i]nternational agreements, even those directly benefitting private persons, generally do not create private rights or provide for a private cause of action in domestic courts.'" (quoting 2 Restatement (Third) of Foreign Relations Law of the United States § 907, cmt. a at 395 (1986))); *Gross v. German Foundation Indus. Initiative*, 549 F.3d 605, 615 (3d Cir. 2008).

Nothing in the provisions of the UNTOC and the Protocols establishes that the treaty was intended to be self-executing. Broad, aspirational language was used in the specific provisions that relate to the protection, support, or repatriation of witnesses and/or victims of transnational organized crime. Furthermore, the treaty states that signatories should take appropriate measures, including enacting legislation if necessary. For example, Articles 24 and 25 of the UNTOC state that each signatory "shall take appropriate measures within its means" to provide effective protection for witnesses and victims of transnational organized crime. Likewise, Article 16 of the Smuggling Protocol states that signatories "shall take . . . appropriate measures, including legislation if necessary" to protect the rights of victims of migrant smuggling. Article 7 of the Trafficking Protocol also states that signatories "shall consider adopting legislative or other appropriate measures

---

[4] The Immigration Judges and the Board later received jurisdiction over claims under the Convention Against Torture pursuant to its implementing regulations. *See* 8 C.F.R. § 1208.18.

that permit victims of trafficking to remain in its territory, temporarily or permanently, in appropriate cases." This general language, which gives signatories discretion to take unspecified measures, but which also calls for implementing legislation, indicates that the treaty's articles relating to witnesses and victims of transnational organized crimes were not intended to be self-executing. *See Matter of Medina*, 19 I&N Dec. at 740.

Moreover, the UNTOC and the Protocols did not explicitly prohibit its signatories from returning individuals who are covered by the treaty to the country of their nationality or to one where they have the right of permanent residence. For instance, Article 8 of the Trafficking Protocol provides for the safe "[r]epatriation of victims of trafficking in persons." Article 8 of the Smuggling Protocol also contemplates the safe "[r]eturn of smuggled migrants." The Protocols provide that the conditions for such an individual's safe repatriation would be determined by the sending and receiving signatory parties. The relevant provisions in the UNTOC for individuals, such as the respondent, who cooperate in a transnational organized crime prosecution do not mandate that such witnesses be granted the right to remain in the signatory country as a form of protection against potential retaliation for their cooperation with the prosecution. *See* UNTOC art. 24 (suggesting measures for protecting witnesses).[5] Nor do they preclude the removal of such persons to their country of nationality or legal residence.

We find that the provisions of the UNTOC do not create an independent basis for relief from removal that can be advanced by the respondent in his removal proceedings. The Immigration Judge therefore did not err in finding that she lacked jurisdiction to consider the respondent's request for relief under the UNTOC and the Protocols. The respondent has not otherwise sought to pursue nonimmigrant status under section 101(a)(15)(S), (T), or (U) of the Act, which provide other avenues under the immigration laws that advance the objectives of the provisions of the UNTOC and the Protocols.

---

[5] A guide issued by the United Nations even considers that a form of witness protection that is contrary to a country's immigration laws may not be required, noting that a "waiver must be sought from countries whose immigration laws prevent the granting of sanctuary to persons with criminal records or require the prosecution of such persons by the authorities." United Nations Office on Drugs and Crime, *Good Practices for the Protection of Witnesses in Criminal Proceedings Involving Organized Crime* 84 (2008), http://www.unodc.org/documents/organized-crime/Witness-protection-manual-Feb08.pdf.

### B. Withholding of Removal

We now turn to the respondent's application for withholding of removal under section 241(b)(3)(A) of the Act and the Convention Against Torture. It is undisputed that on May 11, 2010, the respondent was convicted of conspiracy with intent to distribute and possess with intent to distribute at least a kilogram of heroin, which is an aggravated felony under section 101(a)(43)(B) of the Act. We therefore agree with the Immigration Judge that the respondent is statutorily barred from withholding of removal under the Act and the Convention Against Torture.

As the Immigration Judge properly found, the respondent's aggravated felony involving unlawful trafficking in a controlled substance presumptively constitutes a "particularly serious crime" within the meaning of section 241(b)(3)(B)(ii) of the Act pursuant to the Attorney General's decision in *Matter of Y-L-, A-G- & R-S-R-*, 23 I&N Dec. 270, 274-75 (A.G. 2002). We reject the respondent's argument that the Immigration Judge erred in not making a separate determination to address whether he is a danger to the community, because such a separate "dangerousness" analysis is not necessary to determine that a crime is particularly serious. *Matter of R-A-M-*, 25 I&N Dec. 657, 662 (BIA 2012); *Matter of N-A-M-*, 24 I&N Dec. 336, 342-43 (BIA 2007).

In holding that drug trafficking offenses are presumptively particularly serious crimes, the Attorney General concomitantly recognized that such crimes pose a danger to the community, noting that "[t]he devastating effects of drug trafficking offenses on the health and general welfare, not to mention national security, of this country are well documented." *Matter of Y-L-, A-G- & R-S-R-*, 23 I&N Dec. at 274-76 (citing *Mahini v. INS*, 779 F.2d 1419, 1421 (9th Cir. 1986) (recognizing that drug trafficking "offenders [are] a danger to the community")). In his decision, the Attorney General set forth minimum requirements to overcome the presumption that a crime is particularly serious, one of which is that it involved "a very small quantity of controlled substance." *Id.* at 276. The Immigration Judge found that the respondent did not meet this requirement because his offense involved at least a kilogram of heroin. Therefore the Immigration Judge's decision was consistent with *Matter of Y-L-, A-G- & R-S-R-* and was not in error.

To the extent that the respondent challenges the propriety of *Matter of Y-L-, A-G- & R-S-R-*, it is clear that the Immigration Judge and the Board are bound by the Attorney General's decision. 8 C.F.R. § 1003.1(g) (2012). The respondent's assertion that the statute barring relief for those convicted of particularly serious crimes is "void for vagueness" is likewise unavailing. Neither the Board nor the Immigration Judges have the authority to rule on the constitutionality of the statutes we administer, so we lack jurisdiction to

address this claim. *See Matter of Sanchez-Lopez*, 26 I&N Dec. 71, 74 n.3 (BIA 2012); *Matter of Valdovinos*, 18 I&N Dec. 343, 345-46 (BIA 1982). We therefore conclude that the Immigration Judge properly found the respondent statutorily barred from withholding of removal under both the Act and the Convention Against Torture on account of his conviction for heroin trafficking, which is a particularly serious crime. *See* section 241(b)(3)(B)(ii) of the Act; 8 C.F.R. § 1208.16(d)(2).

### C.  Deferral of Removal Under the Convention Against Torture

The Immigration Judge also properly denied the respondent's application for deferral of removal under the Convention Against Torture.  As the Immigration Judge found, the threatening telephone calls the respondent received were made years before in 2005, shortly after his coconspirators were arrested and before the coconspirator who was a member of Parliament was convicted, and they are therefore dated.  Also, the telephone calls received more recently by the respondent's wife did not contain specific serious threats.  In fact, one caller even offered the respondent assistance with his immigration problems.  These telephone calls are not sufficient to show that the respondent would more likely than not be individually targeted for torture upon his return to Ghana. *Cf. Chavarria v. Gonzalez*, 446 F.3d 508, 518 (3d Cir. 2006) (noting that the lesser well-founded fear asylum standard does not extend "for threats that, while sinister and credible in nature, were not highly imminent or concrete or failed to result in any physical violence or harm to the alien"). Furthermore, reports from the respondent's family that unidentified individuals were looking for him in Ghana for an unspecified purpose, along with generalized comments that others in the community knew that he agreed to testify against his coconspirators, did not objectively establish his claim.

Also, although the respondent's nephew was assaulted by unknown assailants in Ghana in 2009, there is nothing to indicate that the incident was anything more than a random and unrelated act of violence against his nephew. *Cf. Arriaga-Barrientos v. U.S. INS*, 937 F.2d 411, 414 (9th Cir. 1991) (noting that the abduction of the respondent's two brothers by unknown gunmen for unknown reasons does not establish the lesser well-founded fear standard for asylum protection).  The Immigration Judge did not err in finding that there was no link between the nephew's assault and the respondent's fear of persecution. *See Matter of N-M-*, 25 I&N Dec. 526, 532 (BIA 2011) (stating that the motive of a persecutor is a finding of fact to be determined by the Immigration Judge and reviewed for clear error).

The respondent argues that he has established "that he is likely to face torture at the hands of the Ghanaian parliament."  In this regard, we find no merit to his assertions that the Immigration Judge did not give sufficient

weight to certain evidence he presented. Specifically, the Immigration Judge did not clearly err in finding that one of the respondent's coconspirators is and always has been a private citizen. Also, as the Immigration Judge found, the evidence indicates that the other coconspirator is not currently part of the Ghanaian Government, because recent background country reports described him as a former Parliament member. Moreover, the Immigration Judge properly determined that the generalized evidence of government corruption in the record is insufficient to show that the Ghanaian Government would acquiesce in or turn a blind eye to torture.

The Immigration Judge's detailed and thorough decision reflects that she considered the totality of the material evidence, even if it did not reference each piece of evidence individually. *See Yan Lan Wu v. Ashcroft*, 393 F.3d 418, 425 n.10 (3d Cir. 2005). Even while finding the respondent credible as to past events, the Immigration Judge was not obligated to agree with his claimed fear regarding what would happen if he were returned to Ghana. As the Immigration Judge concluded, the respondent failed to satisfy his high burden of establishing that it is more likely than not that he will be tortured by or at the instigation of, or with the consent or acquiescence of, a Ghanaian public official or other person acting in an official capacity. *See Roye v. Att'y Gen. of U.S.*, 693 F.3d 333 (3d Cir. 2012); *see also* 8 C.F.R. § 1208.18(a)(1).

## III. CONCLUSION

In sum, we conclude that the UNTOC and the Protocols did not independently provide the respondent with a new form of relief from removal that he can advance in removal proceedings. The respondent's offense was a "particularly serious crime," which statutorily bars him from withholding of removal under the Act and the Convention Against Torture. The respondent did not satisfy his burden of establishing his claim for deferral of removal under the Convention Against Torture. Accordingly, the respondent's appeal will be dismissed.

**ORDER:** The appeal is dismissed.