# In re H-M-V-, Respondent

*Decided August 25, 1998*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

The Board of Immigration Appeals lacks jurisdiction to adjudicate a claim for relief from deportation pursuant to Article 3 of the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, as there has been no specific legislation to implement the provisions of Article 3, no regulations have been promulgated with respect to Article 3, and the United States Senate has declared that Article 3 is a non-self-executing treaty provision.

Matthew L. Millen, Esquire, Los Angeles, California, for respondent

Before: Board En Banc: VACCA, HEILMAN, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, MATHON, JONES, and GRANT, Board Members. Dissenting Opinions: SCHMIDT, Chairman, joined by GUENDELSBERGER, Board Member; ROSENBERG, Board Member.

HURWITZ, Board Member:

This case was last before us on May 5, 1997, when we assumed jurisdiction by certification of the respondent's previously filed motion to reopen. We requested that the parties submit additional briefs addressing the applicability of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Torture Convention"), to the respondent's circumstances. The respondent, through counsel, has filed an additional brief. The Immigration and Naturalization Service has, to date, not responded to the Board's request for additional briefing. The respondent's motion to reopen will be denied.

## I. PROCEDURAL HISTORY

256

The respondent, a native and citizen of Iran, entered the United States on November 26, 1985, as a refugee. His status subsequently was adjusted to that of lawful permanent resident. On July 26, 1990, the respondent was convicted in the United States District Court, Central District of California, of conspiracy to possess with intent to distribute heroin and possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1998), He was sentenced to 95 months in prison, which sentence later was reduced to 70 months. On August 23, 1994, the Service issued an Order to Show Cause and Notice of Hearing (Form I-221) charging the respondent with deportability under section 241(a)(2)(A)(iii) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(2)(A)(iii) (1994), as an alien convicted of an aggravated felony. In proceedings before an Immigration Judge, the respondent applied for relief from deportation in the form of a waiver of inadmissibility under section 212(c) of the Act, 8 U.S.C. § 1182(c) (1994).

In a decision dated November 9, 1994, the Immigration Judge denied the respondent's application for section 212(c) relief and ordered him deported from the United States. The respondent appealed the Immigration Judge's decision. In a decision dated May 1, 1995, the Board determined that, as of November 14, 1994, the respondent became statutorily ineligible for relief under section 212(c) of the Act, because he had served at least 5 years in prison as a result of his aggravated felony convictions. *See Matter of Gomez-Giraldo*, 20 I&N Dec. 957 (BIA 1995); *Matter of A-A-*, 20 I&N Dec. 492 (BIA 1992). Thus, we dismissed the respondent's appeal.

On September 3, 1996, the respondent filed a motion to reopen before the Board. In his motion, the respondent argues that the Board should recognize the enforceability of Article 3 of the Torture Convention, which prohibits the return ("refoulement") of an individual to a country where there are substantial grounds for believing that he or she would be in danger of being subjected to torture. Specifically, the respondent contends that ordering his deportation to Iran would violate the United States' binding international obligations under the Torture Convention. In addition, he argues that the Protocol Relating to the Status of Refugees, *opened for signature* Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 267 (entered into force Oct. 4, 1967; for the United States Nov. 1, 1968) ("Protocol"), requires an individualized determination of whether the respondent, who was convicted of an aggravated felony for which he has served more than 5 years in prison, represents a "danger to the community." We consider each of the respondent's arguments in turn.


II. UNITED NATIONS CONVENTION AGAINST TORTURE

The Torture Convention was signed by the United States on October 18,

1988, and the Senate adopted its resolution of advice and consent to ratification on October 27, 1990.[1] The treaty became effectively binding on the United States on November 20, 1994.[2] Article 3 of the Convention provides:

> 1. No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.

> 2. For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights.

The respondent concedes that an alien, like himself, who has committed a particularly serious crime and constitutes a danger to the community, may be denied asylum and withholding of deportation. *See* sections 208(d), 243(h)(2) of the Act, 8 U.S.C. §§ 1158(d), 1253(h)(2) (1994). He observes, however, that no such qualification exists under the Torture Convention. The prohibition on refoulement found in Article 3 of the Convention provides no exception for persons convicted of particularly serious crimes. *Cf.* Protocol, *supra*, art. 33(2). The respondent asserts that he would be subjected to imprisonment, torture, and execution if forced to return to Iran. Thus, he maintains that his deportation to Iran would violate Article 3 of the Torture Convention.

Upon review, we decline to apply the prohibition on refoulement set forth in Article 3 of the Torture Convention to the respondent. Initially, we note that the jurisdiction of this Board, and of the Immigration Judge, is limited by statute and regulation to that which has been delegated by the Attorney General. *See Galo-Garcia v. INS*, 86 F.3d 916, 918 (9th Cir. 1996) (quoting with approval the Board's holding in *Matter of Sano*, 19 I&N Dec. 299, 300-01 (BIA 1985), that "'[u]nless the regulations affirmatively grant us power to act in a particular matter, we have no appellate jurisdiction over it'"); *see also Matter of Hernandez-Puente*, 20 I&N Dec. 335, 339 (BIA 1991).

To date, there has been no specific implementing legislation of Article 3 of the Torture Convention, although the House of Representatives has

---

[1] 136 Cong. Rec. S17,486, S17,492 (daily ed. Oct. 27, 1990).

[2] One month earlier, the President deposited the instrument of ratification with the Secretary-General of the United Nations. *See* 74 Interpreter Releases, No. 45, Nov. 21, 1997, at 1773, 1781 (citing U.N. Doc. No. 571 Leg/SER. E/13, IV.9 (1992); Torture Convention, *supra*, art. 27(2)).

[3] *See* Torture Victims Relief Act of 1995, H.R. 1416 104th Cong. § 2(10) (1996) (introduced into House committees on April 5, 1995, and noting that "[t]he United States has ratified the [Torture Convention] but has not implemented all provisions of the convention"); *see also* H.R. 933, 103d Cong., § 1(1993); H.R. 6017, 102d Cong., § 1 (1992).

considered bills concerning the Convention.[3]  There also have been no regulations promulgated with respect to Article 3. In addition,  we  note  that since  ratification  of  the  treaty  in 1990, Congress has spoken on the availability of asylum and withholding of deportation in this country to those convicted of aggravated felonies. *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, § 303(b)(3), 110 Stat. 3009-546, 3009-586 ("IIRIRA"). We have considered these changes and their effect on existing law. We do not find that their enactment delegates authority to the Immigration Judge or this Board to grant the respondent, a convicted aggravated felon sentenced to 5 years or more in prison, any relief from deportation under the Torture Convention. *See Matter of Medina*, 19 I&N Dec. 734 (BIA 1988).

Furthermore, as a condition of ratifying the Torture Convention, the Senate included the following declaration:

> (1)  That the United States declares that the provisions of Articles 1 through 16 of the Convention are not self-executing.

136 Cong. Rec. S17,486, S17,491 (daily ed. Oct. 27, 1990).

This  declaration  received  the  imprimatur  of  the  President  when  he deposited  the  instrument  of  ratification  with  the  Secretary-General of the United Nations. Where the President and the Senate, as opposed merely to their spokespersons or treaty negotiators, have expressed an intent to have a treaty be non-self-executing, this intent has been deemed controlling by the courts. *See Islamic Republic of Iran v. Boeing Co*., 771 F.2d 1279, 1284 (9th Cir. 1985) (relying on preratification statement of the President), *cert. dismissed*, 479 U.S. 957 (1986); *Frolova  v.  Union  of  Soviet  Socialist Republics,* 761 F.2d 370, 376 (7th Cir. 1985) (same); *see also United States v. Postal,* 589 F.2d 862, 881-83 (5th Cir.) (relying on preratification statements of Department of State officials and United States negotiators), *cert. denied*, 444 U.S. 832 (1979).

Moreover, several courts have held that international treaty provisions generally do not attain the force of law until the United States has enacted legislation  or  promulgated  regulations  to  implement  such  provisions. *United States v. Aguilar*, 883 F.2d 662, 680 (9th Cir. 1989) (stating that the United Nations Protocol Relating to the Status of Refugees "was not intended to be self-executing. As the Protocol is not a self-executing treaty having the force of law, it is only helpful as a guide to Congress's statutory intent in enacting the 1980 Refugee Act" (citation omitted)), *cert. denied*, 498 U.S. 1046 (1991); *Bertrand v. Sava*, 684 F.2d 204, 218-19 (2d Cir. 1982) (holding that provisions of the  Protocol "were not themselves a source of rights under  our  law  unless  and  until  Congress  implemented  them  by

appropriate legislation"); *see also Haitian Refugee Center, Inc. v. Baker,* 949 F.2d 1109, 1110 (11th Cir. 1991), *cert. denied*, 502 U.S. 1122 (1992). With respect to whether Article 3 of the Torture Convention is a self-executing provision, we deem the actions and pronouncements of the President and the Senate to be controlling. At present, therefore, Article 3 provides no relief to aliens in deportation, exclusion, or removal proceedings.

## III. INDIVIDUALIZED DETERMINATION OF DANGER TO THE COMMUNITY

The respondent also contends that, in light of the obligations imposed on the United States by the Protocol, the Immigration Judge and the Board must conduct an individualized determination of whether he represents a "danger to the community" before concluding that he is ineligible for withholding of deportation under section 243(h) of the Act.

With certain exceptions, aggravated felons are barred from applying for withholding of deportation. Section 243(h)(2)(B) of the Act. For aliens who have filed their applications before April 1, 1997, the effective date of the IIRIRA, the Attorney General has the discretion to override this bar under section 243(h)(3) of the Act, as added by section 413(a) of the AEDPA, 110 Stat. at 1269. The Attorney General may allow an alien to apply for withholding if he has been sentenced to an aggregate of less than 5 years in prison and the Attorney General determines in her discretion that the alien's crime is not particularly serious. 8 C.F.R. §§ 208.16(c)(2), (3) (1998). In a recent precedent decision, we established the standard under which this discretion should be exercised. *Matter of Q-T-M-T-*, 21 I&N Dec. 639 (BIA 1996).

The regulations, however, do not allow for the exercise of discretion in the respondent's case. An alien whose proceedings were commenced prior to April 1, 1997, and who has been convicted of an aggravated felony and sentenced to an aggregate term of 5 years or more, is not eligible for withholding of deportation. The regulations at 8 C.F.R. §§ 208.16(c)(2) and (3) provide in part:

> (2) *Mandatory denials.* Except as provided in paragraph (c)(3) of this section, an application for withholding of removal *shall be denied* if the applicant falls within section 241(b)(3)(B) of the Act or, *for applications for withholding of deportation adjudicated in proceedings commenced prior to April 1, 1997, within section 243(h)(2) of the Act* as it appeared prior to that date [barring aggravated felons]. For purposes of section 241(b)(3)(B)(ii) of the Act, or section 243(h)(2)(B) of the Act as it appeared prior to April 1, 1997, an alien who has been convicted of a particularly serious crime shall be considered to constitute a danger to the community. . . .

> (3) *Exception to the prohibition on withholding of deportation in certain cases.* Section 243(h)(3) of the Act, as added by section 413 of Public Law 104-132, shall

apply only to applications adjudicated in proceedings commenced before April 1, 1997, and in which final action had not been taken before April 24, 1996. *The discretion permitted by that section to override section 243(h)(2) of the Act shall be exercised only in the case of an applicant convicted of an aggravated felony (or felonies) where he or she was sentenced to an aggregate term of imprisonment of less than 5 years* and the immigration judge determines on an individual basis that the crime (or crimes) of which the applicant was convicted does not constitute a particularly serious crime. Nevertheless, it shall be presumed that an alien convicted of an aggravated felony has been convicted of a particularly serious crime. Except in the cases specified in this paragraph, the grounds for denial of withholding of deportation in section 243(h)(2) of the Act as it appeared prior to April 1, 1997, shall be deemed to comply with the 1967 Protocol Relating to the Status of Refugees.

(Emphasis added.)

We find that these regulations address the respondent's arguments on this issue. The regulations specifically address the appropriate interpretation of the Protocol and the question of whether a separate consideration of an alien's dangerousness to the community is required. We note that once a regulation is properly issued by the Attorney General, it is the obligation of this Board and the Immigration Judges to enforce it. Regulations promulgated by the Attorney General have the force and effect of law as to this Board and the Immigration Judges. *Matter of Fede*, 20 I&N Dec. 35 (BIA 1989). In the case before us, the respondent was convicted of an aggravated felony and sentenced to more than 5 years in prison. He is therefore ineligible for withholding of deportation.

## IV. CONCLUSION

In sum, we conclude that the Board currently lacks jurisdiction to grant the respondent's request for relief from deportation under the Torture Convention. Furthermore, we conclude that we are not required to provide an individualized determination of whether the respondent represents a "danger to the community" prior to finding that he is ineligible for withholding of deportation. Accordingly, the respondent's motion will be denied.

**ORDER:** The motion to reopen is denied.

Vice Chairman Mary Maguire Dunne and Board Member Lori Scialabba did not participate in the decision in this case.

*DISSENTING OPINION:* Paul W. Schmidt, Chairman, in which John Guendelsberger, Board Member, joins.

I respectfully dissent.

This respondent, who previously was admitted to the United States as a refugee, makes a prima facie claim that his removal from the United States under an order of deportation to Iran would violate the obligations of the United States under Article 3 of the  Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Torture Convention"). This article requires the United States not to expel, return, or extradite a person to another state where there are substantial grounds for believing that he or she would be in danger of being subjected to torture. At an absolute minimum, this case should be referred to the General Counsel of the Immigration and Naturalization Service for an adjudication under Article 3 before the order of deportation vests.

## I. THE TORTURE CONVENTION APPEARS TO BIND THE UNITED STATES EVEN WITHOUT IMPLEMENTING LEGISLATION AND ENABLING REGULATIONS

On March 6, 1997, in connection with a final rule making concerning revisions to the inspection, removal, and asylum systems under the immigration laws, the Attorney General clearly stated that Article 3 is in force and binding on the executive branch of the United States Government:

> This article [Article 3] has been in effect for the United States since November 1994. Although Article 3 of the Torture Convention itself is not self-executing, the Attorney General has *sufficient administrative authority to ensure that the United States observes the limitations on removal required* by this provision. In fact, the Service has received and considered individual requests for relief under the Torture convention since November 1994 and has arranged for relief where appropriate. For the present, the Department intends to continue to carry out the non-refoulement provision of the Torture Convention through its *existing administrative authority rather than by promulgating regulations*.

62 Fed. Reg. 10,312, 10,316 (1997) (emphasis added).

Thus, the Attorney General recognized that the binding nature of Article 3 depended on neither implementing legislation nor a specific regulatory delegation. Stated another way, neither the non-self-executing nature of Article 3 nor the lack of a regulatory delegation to this  Board, both of which were cited by the majority, relieve us, as members of the executive branch, from the obligation to ensure that the United States complies with its international treaty obligations under Article 3.

The Service has taken the same position as the Attorney General. The General Counsel of the Service has publicly stated in a memorandum as follows:

> Article 3 is a United States law, *equal in force to a federal statute. See* Article VII, clause 2 of the U.S. Constitution. Such a non-self-executing treaty imposes on the United States "an international *obligation to adjust its laws and institutions as may be necessary* to give effect to the agreement." Thus, INS has a *legal duty* to ensure compliance with Article 3 in the cases of aliens it may remove from the United States.

Office of the General Counsel, INS, U.S. Dep't of Justice, *Compliance with Article 3 of the Convention Against Torture in the cases of removable aliens* (May 14, 1997), *reprinted in* 75 Interpreter Releases, No. 10, Mar. 16, 1998, at 375, 376 ("INS Memo") (citation omitted) (emphasis added).

I also note that the Attorney General has delegated to us such of her discretion and authority "as is appropriate and necessary for the disposition of the case." 8 C.F.R. § 3.1(d)(1) (1998). While this delegation is subject to any specific limitations established by regulation, there is no such specific regulatory limitation or exclusive regulatory delegation to another agency (such as the Service) that would prohibit us from acting on a case arising under the Torture Convention.

## II. DISCUSSION

I recognize that the pronouncements of the Attorney General and the General Counsel of the Service, which are neither incorporated into regulations nor embodied in a precedent ruling by the Attorney General in an individual case, are not binding on us. *See, e.g., Matter of Chang*, 20 I&N Dec. 38 (BIA 1989) (stating that the Attorney General's "guidelines" are not binding on the Board or Immigration Judges), *superseded on other grounds, Matter of X-P-T-*, 21 I&N Dec. 634 (BIA 1996). On the other hand, in the context of this particular issue, I would give both interpretive statements serious consideration.

The non-self-executing nature of Article 3 appears to relate *exclusively* to its lack of enforceability in Article III courts. It evidently is binding on the United States and on its executive branch officers. Although this Board performs quasi-judicial adjudicative functions, we clearly are a part of the Department of Justice and the executive branch. It seems unusual that the prosecutor, the Service, would be under an international treaty obligation that we, as independent adjudicators within the executive branch, have no duty to recognize, facilitate, or enforce in any manner whatsoever. Thus, it is not obvious to me that we properly discharge our constitutional duties as members of the executive branch by refusing to address compliance with Article 3 in any meaningful way in this particular case.

As a prudent measure, before issuing a final order of deportation in this or any other case where a prima facie case under Article 3 has been made out and no other avenues of relief are available under the immigration laws, I would refer the case to the General Counsel of the Service for a determi-

nation under the current administrative procedures to implement Article 3 of the Torture Convention. *See* INS Memo, *supra*, at 379. In that way, we can help ensure that the United States discharges its duties under domestic and international law, while not interfering with any existing "informal delegation" by the Attorney General of Article 3 enforcement responsibility to the General Counsel of the Service. This action is completely consistent with our delegated authority under 8 C.F.R. § 3.1(d)(1).

### III. SUMMARY AND CONCLUSION

The Department of Justice, through the Attorney General and the General Counsel of the Service, takes the position that the United States has a binding obligation under Article 3 of the Torture Convention not to remove an individual to a country where he or she will face torture. According to the foregoing sources, that obligation is not in any way vitiated or lessened by the non-self-executing nature of Article 3, nor is it dependent on any specific regulatory delegation from the Attorney General.

This respondent, who was admitted to the United States as a refugee, has established a prima facie case that his removal to Iran would violate Article 3. The most prudent course for us would be to refer this matter to the General Counsel of the Service for a determination whether the respondent's ultimate removal under an order of deportation would comply with Article 3. The respondent's motion to reopen should be granted, and the final order of deportation in his case should be conditioned on the entry of a written determination by the General Counsel that execution of that order would not violate Article 3. Because the majority's disposition fails to provide even this minimal safeguard to ensure that we in the United States are meeting our domestic and international legal obligations, I respectfully dissent.

*DISSENTING OPINION:* Lory D. Rosenberg, Board Member

I respectfully dissent.

The United States' obligation under the Article 3 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture"),[1] which provides that "[n]o State

---

[1]Although a consistent shorthand reference to a statute or international document is an attractive option, it should be in keeping with the essence of that document. I find use of the reference "Torture Convention" when referring to an international convention *against* torture

Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture," has been advocated by the respondent and is undisputed by the Immigration and Naturalization Service. As I believe that the respondent has set forth a colorable claim that he will be tortured and very possibly killed if he is forcibly returned to Iran, I regard the majority's decision to dispose of the respondent's motion to reopen his deportation proceedings on jurisdictional grounds, leaving the Board's order of deportation to Iran undisturbed, as improper and erroneous.

The majority's reason for not addressing the merits of the respondent's claim—that there presently exists no legislation implementing the Convention Against Torture, and that the Attorney General has not promulgated specific regulations or explicitly delegated authority to the Board to adjudicate claims under Article 3—inexplicably ignores our own authority and obscures the principal feature of the respondent's claim. This result strikes me as a violation of our obligation as the quasi-judicial, precedent-setting body acting on behalf of the Attorney General, a component of the executive branch of the United States Government, to ensure compliance with this nation's international treaty obligations and with internationally recognized human rights norms.

I cannot agree that this outcome is either a necessary or appropriate outcome on purely legal grounds. Not only is it unwarranted and contrary to the authority extended to us by regulation, but it reflects the worst and not the best of this country's human rights history. Consequently, I dissent.

## I. ISSUE BEFORE THE BOARD

We are presented with an extremely serious claim for protection brought pursuant to an international treaty under which the United States currently is obligated. Not only is the United States a party to the Convention Against Torture, but the Service, a component of the Department of Justice and a party to this action, has acknowledged that it is legally bound to comply with Article 3. *See* Office of the General Counsel, INS, U.S. Dep't of Justice, *Compliance with Article 3 of the Convention Against Torture in the cases of removable aliens* (May 14, 1997), *reprinted in* 75 Interpreter Releases, No. 10, Mar. 16, 1998, at 375, 376 ("INS Memo").

---

to be so offensive that I cannot and will not use it. I believe that its use minimizes and belittles the essence of torture and the fact that the United States has signed a binding convention *against* torture that we are obligated to carry out.

The issue before us is this: Given that the Board, an administrative component of the same department of the executive branch of the United States Government, is bound by the Convention Against Torture, what obligation do we have to consider and act upon the respondent's claim in the absence of any specific regulations? Ultimately, we are faced with the question which the majority has simply evaded by declining to assume jurisdiction over the respondent's claim: *how* to comply with the United States' undisputed obligations under Article 3 despite our momentary inability to grant the respondent a specific form of relief from deportation.

## II. RESPONDENT'S CLAIM AND THE CONVENTION AGAINST TORTURE

The respondent requests more than a specific form of statutory relief from deportation. He seeks protection from deportation to state-sponsored torture in his homeland. He has established that Iranian authorities are likely to torture him simply because he openly expressed his opposition to the Ayatollah Khomeini.

### A. Basis of the Respondent's Claim in Relation to the Convention Against Torture

The respondent asserted that following the Islamic revolution in Iran, he was the team captain at a soccer match. As captain, he was told to carry a large portrait of the Ayatollah Khomeini around the soccer field before the game but refused to do so and threw the portrait to the ground. The respondent was ejected from the game and was later informed by his coach that his life was in danger due to "anti-Khomeini activities." The respondent presented evidence, which is contained in the record of proceedings, that in November 1982, he was tried and convicted in absentia and that there is an outstanding warrant for his arrest if he returns to Iran. The warrant indicates that if he turns himself in, he will be subject to life imprisonment. If he is arrested, however, he will be *executed* for the crime of "insulting the leader of the revolution."

The record contains a portion of a February 1996 profile of asylum claims and country conditions for Iran, prepared by the Department of State, which states that the Government of Iran

> continues to be a major abuser of human rights. There was no evidence of improvement in 1995. Systematic abuses include extrajudicial killings and summary executions; *widespread use of torture and other degrading treatment*; disappearances; arbitrary arrest and detention; lack of fair trials; harsh prison conditions; and repression of the freedoms of speech, press, assembly, association, and religion, as well as infringements on the right of privacy. . . . In August, the UNHCR approved a resolution con-

266

demning the "extensive and continuing human rights abuses by the Government of the Islamic Republic of Iran . . . .

Bureau of Democracy, Human Rights and labor, U.S. Dep't of State, *Iran - Profile of Asylum Claims & Country Conditions* (Feb. 1996) [hereinafter *Profile*] (emphasis added). In addition, the record contains a Department of State country report on human rights practices for 1993 pertaining to Iran, which finds reports of torture and ill-treatment of detainees to be credible. Committees on Foreign Affairs and Foreign Relations, 103d Congress, 2d Sess., *Country Reports on Human Rights Practices for 1993* 1176 (Joint Comm. Print 1994). It describes the common methods of torture reported to include "suspension for long periods in contorted positions, burning with cigarettes, and, most frequently, severe and repeated beatings with cables or other instruments on the back and on the soles of the feet," and reports that prisoners "are frequently held in solitary confinement or denied adequate rations or medical care . . . [and that] protests against poor prison conditions in the past reportedly prompted beatings, denial of medical care, and, in some cases, execution." *Id.* at 1177.

## B. Terms of the United Nations Convention Against Torture

The Convention Against Torture is an expression of the international community's desire to eliminate torture and other cruel, inhuman, or degrading treatment or punishment throughout the world.[2] Article 1 of the Convention Against Torture, in pertinent part, defines "torture" as

any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

To be considered "torture" under the Convention Against Torture, an act (or series of acts) must meet a three-part test. First, the act must involve the infliction of severe pain or suffering, either physical or mental.[3] Second, the torture must be intentionally inflicted. Third, the torture must occur at

---

[2]*See* Report of the Committee on Foreign Relations, S. Exec. Rep. No. 30, 101st Cong., 2d Sess. 1, 2-3 (1990).

[3]In its resolution of advice and consent, the Senate included the understanding that "mental pain or suffering" refers to prolonged mental harm caused by or resulting from

(1) the intentional infliction or threatened infliction of severe physical pain or suffering; (2) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality; (3) the threat of imminent death; or (4) the threat that anoth-

the instigation of, or with the consent or *acquiescence* of, a public official.

Although Article 3 of the Convention Against Torture is modeled after Article 33 of the 1951 Convention Relating to the Status of Refugees, [4] which prohibits returning a refugee to a place "where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion," protection under the Convention Against Torture is unconditional and available to *any* person facing torture as defined in the Convention. *See* J.H. Burgers and H. Danelius, *The United Nations Convention against Torture: A Handbook* 125 (1988).

In particular, an individual who seeks protection under Article 3 of the Convention Against Torture is not required to demonstrate that he or she would be tortured on account of a particular belief or immutable characteristic. *See* Report of the Committee on Foreign Relations, S. Exec. Rep. No. 30, 101st Cong., 2d Sess. 1, 16 (1990) ("Senate Report")(stating that Article 3 "would extend the prohibition on deportation under existing U.S. law to cases of torture not involving persecution on one of the listed impermissible grounds"); *cf., e.g., Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir. 1995) (holding that even "morally reprehensible" treatment is not "persecution" for asylum purposes unless it occurs "on account of" one of the five grounds enumerated in the Immigration and Nationality Act); *Matter of T-M-B-*, 21 I&N Dec. 775 (BIA 1997), *aff'd sub nom. Borja v. INS*, 139 F.3d 1251 (9th Cir. 1998), Moreover, the motivations or beliefs of the torturer are not relevant to the analysis of a country's obligation to provide protection under Article 3. *Cf., e.g., INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *Matter of S-P-*, 21 I&N Dec. 486 (BIA 1996) (holding that the applicant must show that persecution was motivated, at least in part, by an actual or imputed protected ground).[5]

---

er person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality.

136 Cong. Rec. S17,486, S17,486 (daily ed. Oct. 27, 1990) ("Senate Resolution").

[4]Convention Relating to the Status of Refugees, *adopted* July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150, (entered into force Apr. 22, 1954) ("Convention"), as incorporated within the provisions of the Protocol Relating to the Status of Refugees, *opened for signature* Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 267 (entered into force Oct. 4, 1967; for the United States Nov. 1, 1968); *see also* sections 208 and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158, 1253(h) (1994), as enacted in United States law by the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102.

[5]It is worth noting that even under asylum law, the intent or motive of the persecutor need not be malicious, and punishment inflicted by a "legitimate" government may constitute persecution. *Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996); *see also Pitcherskaia v. INS*, 118 F.3d 641 (9th Cir. 1997)(clarifying that an intent to harm need not be shown to establish

Furthermore, Article 3 contains no exclusionary clause creating exceptions to eligibility for protection, such as those set forth in Article 33(2) of the Convention and codified in our domestic law at section 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h) (1994). Thus, although a torture victim may have been a persecutor or torturer of others, convicted of an "aggravated felony" or a "particularly serious crime," or considered a threat to United States security, he remains entitled to nonrefoulement. *Cf.* 208(d), 243(h)(2) of the Act, 8 U.S.C. §§ 1154(d), 1253(h) (1994); *Matter of Q-T-M-T-*, 21 I&N Dec. 639 (BIA 1996). Accordingly, unlike the limited protection afforded under the Convention and Protocol, the prohibition against refoulement set forth in Article 3 is absolute.[6]

In addition, the Senate has clarified that both actual knowledge and "willful blindness" on the part of an official constitutes "acquiescence" within the meaning of Article 1 of the Convention Against Torture, Senate Report, *supra*, at 9, and that a state "could not through its domestic sanctions defeat the object and purpose of the Convention to prohibit torture." 136 Cong. Rec. S17,486, S17,491 (daily ed. Oct. 27, 1990) ("Senate Resolution") (referring to the exception for treatment "arising only from, inherent in or incidental to lawful sanctions," quoting Convention Against Torture, art. 1). The Senate also has included the understanding that the phrase, "substantial grounds for believing that he would be in danger of being subjected to torture," in Article 3 is to be construed to mean that it is "'more likely than not that the alien would be subject to persecution,'" thus imposing an evidentiary standard analogous to the "clear probability of persecution" standard enunciated by the Supreme Court with regard to claims for withholding of deportation. Senate Report, *supra*, at 10 (quoting *INS v. Stevic*, 467 U.S. 407 (1984)); *see also* David P. Stewart, *The Convention Against Torture and the Reception of International Criminal Law within the United States*, 15 Nova L. Rev. 449, 458 (1991)(stating that "because adherence to the Convention would require (rather than permit) non-refoulement, the . . . more stringent [clear probability] standard was considered the appropriate referent as a matter of domestic law"); *cf. INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987) (holding that eligibility for asylum requires a reasonable likelihood of persecution).

---

a persecutory motive); *Rodriguez-Roman v. INS*, 98 F.3d 416 (9th Cir. 1996) (finding that excessive state punishment provides a basis to find persecution based on imputed political opinion),

[6]Elisa C. Massimino, *Relief from Deportation Under Article 3 of the United Nations Convention Against Torture,* in 2 1997-98 Immigration and Naturality Law Handbook 467, 472 (American Immigration Lawyers Association ed., 1997) (stating that "[i]f there are substantial grounds for believing that an individual would be in danger of being subjected to torture if returned, the State may not, *under any circumstances*, return him or her"(emphasis added)).

Under both the terms of the Convention Against Torture and the Senate's interpretations of those terms, the respondent has presented sufficient evidence to establish that if forcibly returned to Iran, he faces a clear probability of severe physical and/or mental pain intentionally inflicted by a state official, not arising solely from lawful criminal sanctions. Accordingly, the respondent has set forth at least a prima facie case that his deportation would violate the prohibition on refoulement articulated in Article 3 of the Convention Against Torture.

### III. JURISDICTION TO ACT IN RESPONSE TO THE RESPONDENT'S CLAIM

Our jurisdiction to act on the substance of the respondent's claim under Article 3 of the Convention Against Torture depends principally on whether the United States is obligated to consider and observe Article 3 of the Convention Against Torture, and if so, whether the Board has any obligation—and any corresponding discretion or authority—to respond to, or to enforce it. In answering these questions, we must address the meaning and effect of the principle that, in the absence of implementing legislation codifying the terms of the international document in domestic law, a treaty must be self-executing. We also must address the function of the Board and our place as a quasi-judicial tribunal within the Department of Justice, and the executive branch.

Treaties, like the constitution and other federal laws, are considered by the Supremacy Clause to be the "law of the land."[7] As elaborated above, Article 3 of the Convention Against Torture prohibits the return of an individual to a country in which he or she has faced or would face torture. The bare obligation not to return—imposed on the United States as a signatory to this treaty—is not dependent on its codification in domestic law or other implementing legislation, and, consequently, the "enforceability" of the Convention Against Torture is acknowledged by the Service. Given these considerations, I conclude that the United States has an obligation not to order, allow, facilitate, or effectuate the return of an individual who faced or would face torture, as defined in Article 3, to a place where such torture occurred or would occur.

---

[7]The Supremacy Clause of the United States Constitution provides that the "Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

As it is undisputed that Article 3 of the Convention Against Torture, under which the respondent makes his claim, is part of a treaty that is binding on the United States, it is binding on executive branch departments and officials. *See* INS Memo, *supra*. Immigration Judges and Board Members who preside over quasi-judicial trial and appellate level tribunals within the Department of Justice are not exempted from this obligation.

As a quasi-judicial tribunal within the Department of Justice, the Board exercises the authority delegated by Congress to the Attorney General according to federal regulations, which provide:

> Subject to any specific limitation prescribed by this chapter, in considering and determining cases before it as provided in this part the Board shall exercise such discretion and authority conferred upon the Attorney General by law as is appropriate and necessary for the disposition of the case.

8 C.F.R. § 3.1(d) (1998),

The United States Court of Appeals for the Ninth Circuit, the jurisdiction in which this case arises, recently has emphasized the critical role played by Immigration Judges—and, by logical extension, members of this Board—"in the congressional scheme for the fair treatment of aliens within our borders." *Singh v. Waters*, 87 F.3d 346, 346 (9th Cir. 1996), The court has stated:

> Congress has created immigration judges, who, although they do not have the security of life tenure, are intended to act as judges—that is, as persons fearlessly and impartially applying the laws of the United States to the agency to which they are assigned; and whose orders are to be obeyed by such agency as the orders of other judges of the United States are to be obeyed.

*Id.* at 346, 347.

The next question is whether the Board is obligated not to order the respondent deported, or is authorized to act affirmatively in some other way to prevent his deportation. I conclude that whether or not the treaty is self-executing, and whether or not the Attorney General has specifically ordered us to act in compliance with the treaty, we do have such obligation and authority.

### A. Article 3 as a Self-Executing Provision

Although a treaty is equivalent in stature and force to other federal law, there is no basis for an individual to assert a treaty-based claim directly before a United States court, unless the applicable treaty provision is "self-executing." *See, e.g.*, *Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370, 373 (7th Cir. 1985); *United States v. Postal*, 589 F.2d 862, 875 (5th Cir.), *cert. denied*, 444 U.S. 832 (1979), To say that a treaty, or specific provision thereof, is "self-executing" means that it may be enforced in the

federal courts without the need for any prior congressional action to "implement" the treaty or a particular provision of the treaty.

I do not dispute that legislation "generally" is required to implement treaty provisions. *See, e.g., Islamic Republic of Iran v. Boeing Co.,* 771 F.2d 1279, 1284 (9th Cir. 1985), *cert. dismissed*, 479 U.S. 957 (1986), Nevertheless, I find that majority's classification of the treaty before us—particularly Article 3—as not self-executing is contrary to its actual terms, dependent on precedents in cases that involved other treaties with different terms, and reliant on generalities that belie the four distinct ways in which the courts have assessed whether a treaty provision is self-executing. *See* Carlos M. Vazquez, *The Four Doctrines of Self-Executing Treaties*, 89 Am. J. Int'l L. 695 (1995). These include considering (1) the intent of the parties to the treaty, as revealed either in the language of the treaty itself or in the ratification instruments, (2) whether the treaty provision poses a justiciable question, (3) whether the provision conveys to individuals a private right of action, and (4) whether the substance of the treaty provision falls within the constitutional authority of the parties to the agreement. *Id.; see also* Kristen B. Rosati, *The United Nations Convention Against Torture: A Detailed Examination of the Convention as an Alternative for Asylum Seekers*, 97-12 Immigration Briefings 5, 6 (1997) [hereinafter Rosati, *Detailed Examination*].

## 1. Intent

A presumption exists that a treaty *is* self-executing *unless the treaty language* at issue "manifests an intention that it shall not become effective as domestic law without the enactment of implementing legislation." *Rainbow Navigation, Inc. v. Department of Navy*, 686 F.Supp. 354, 357 (D.D.C. Cir. 1988). The single declaration made by the Senate in ratification documents that the treaty is not self-executing, upon which the majority relies, is not dispositive of intent. By contrast, the pertinent language of the Convention Against Torture reveals that it is *not* among those treaties that simply articulate aspirations, rather than imposing obligations, which have been found by the courts to be unenforceable and have been described as "non-self-executing." *See* Vazquez, *supra*, at 712; *see also INS v. Stevic, supra*, at 429 n.22 (1984) (describing Article 34 of the Refugee Convention as "precatory and not self-executing," in contrast to the nonrefoulement language contained in Article 33, which "gave the refugee an *entitlement* to avoid deportation" (emphasis added)); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 809 (D.C. Cir. 1984) (Bork, J., concurring) (commenting that Articles 1 and 2 of the United Nations Charter state "mere aspirations . . . none of which can sensibly be thought to have been intended to be judicially enforceable at the behest of individuals"), *cert. denied*, 470 U.S. 1003 (1985),

Although the majority relies principally on the "intent of the parties" prong to conclude that Article 3 is not self-executing, the majority's conclusion is not supported by the language of the treaty. The language of Article 3 of the Convention Against Torture imposes specific obligations on signatories, stating that a party to the convention *shall not* return an individual to a place where there are substantial grounds for believing that he or she would face torture. Such strict language suggests that this prohibition has the force of law upon a country's accession to the treaty. *See INS v. Cardoza-Fonseca, supra*, at 432-33 (stating that the United States has been bound by the Protocol since 1968, when it became a signatory); *INS v. Stevic, supra*, at 426 n.20 (quoting H.R. Rep. No. 96-608, at 17-18 (1979), as stating that a revision of the language in section 243(h) of the Act was necessary "'so that U.S. statutory law clearly reflects our legal obligations under international agreements'").

Moreover, unlike certain other provisions of the Convention Against Torture, Article 3 does not call for domestic implementing legislation. *Cf., e.g.*, Convention Against Torture, *supra*, art. 4 (requiring each contracting state to "ensure that all acts of torture are offences under its criminal law" and to "make these offences punishable by appropriate penalties").[8] Accordingly, the straightforward prohibition articulated by the specific language of Article 3 reflects that the parties intended the nonrefoulement provision to be self-executing, and thus enforceable without the need for implementing legislation. At a minimum, the language used by the Senate in the ratification instrument in no way forecloses the Board's authority to act under 8 C.F.R. § 3.1(d).

## 2. Justiciability

A justiciable question of law, indicating that a treaty provision may be found to be self-executing, is determined by considering the purpose of the treaty provision, the existence of domestic procedures appropriate for direct implementation of the treaty provision, the availability and feasibility of alternative methods of enforcing the treaty provision, and the "immediate and long-range social consequences" of deciding that the provision either is or is not self-executing), *Saipan v. United States Dep't of Interior*, 502 F.2d 90, 97 (9th Cir. 1974), *cert. denied*, 420 U.S. 1003 (1975); *see also Frolova v. Union of Soviet Socialist Republics, supra*, at 373 (noting that courts examine several factors, including the four listed, in deciding the self-executing question); *United States v. Postal, supra*, at 877 (citing with approval four factors articulated in *Saipan*).

---

[8]In April 1994, Congress enacted legislation criminalizing torture, thereby effectively implementing Article 4 of the Convention. *See* 18 U.S.C. § 2340A (1994).

Consideration of the purpose of the Convention Against Torture and the "immediate and long-range social consequences" of finding Article 3 to be self-executing favors such a designation. *Saipan v. United States Dep't of Interior, supra*, at 97. In addition, the existence of available domestic procedures, and the availability and feasibility of alternate methods of enforcing the treaty, favors finding the treaty to raise a justiciable question of law rendering the treaty self-executing.

### 3. Private Right of Action

"Many treaties, like most constitutional provisions and many federal statutes, do not themselves purport to confer private rights of action. . . . [Nevertheless, a] treaty that does not itself address private enforcement is no less judicially enforceable by individuals than constitutional or statutory provisions that do not themselves address private enforcement." Vazquez, *supra*, at 719-20. Thus, although commentators generally agree that the provision does not confer a private cause of action by which individuals may enforce the terms of Article 3 in court, this does not mean that individuals are prohibited from relying on Article 3 as substantive law in deportation or removal proceedings. *See* Rosati *Detailed Examination, supra*, at 10; Stewart, *supra*, at 467. Consequently, an individual such as the respondent need not enjoy a private right of action under the Convention Against Torture to be deserving of protection from refoulement according to the terms of Article 3.

### 4. Constitutional Authority

Although the issue has not been widely addressed by the courts, authorities concur that a treaty that seeks to accomplish something that falls within the exclusive lawmaking authority of Congress is not self-executing. *See* Vazquez, *supra*, at 718-19; Rosati, *Detailed Examination, supra*, at 10. The sorts of treaties that have been deemed non-self-executing because they lack such constitutional authority include those that attempt to raise revenue,[9] those that purport to criminalize certain conduct,[10] and those that attempt to appropriate money. *See* Vazquez, *supra*, at 718-19; Rosati, *Detailed Examination, supra,* at 10; *Restatement of the law (Third) The Foreign Relations Law of the United States* § 111, cmt. i (1986), The Convention Against Torture is not among these types of treaties.

---

[9]*See, e.g., Edwards v. Carter,* 580 F.2d 1055, 1058 (D.C. Cir. 1978), *cert. denied*, 436 U.S. 907 (1978).

[10]*See, e.g., Hopson v. Krebs*, 622 F.2d 1375, 1380 (9th Cir. 1980); *The Over the Top*, 5 F.2d 838, 845 (D. Conn. 1925).

In becoming a signatory to the Convention Against Torture, the United States clearly manifested its "opposition to torture and commitment to combat the practice of torture and express[ed] support for the involvement of the U.S. Government in the formulation of international standards and effective implementing mechanisms against torture." Senate Report, *supra*, at 3. According to the Ninth Circuit, "[T]he right to be free from official torture is fundamental and universal, a right deserving of the highest status under international law . . . ." *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 717 (9th Cir. 1992), *cert. denied,* 507 U.S. 1017 (1993); *see also Filartiga v. Pena-Irala*, 630 F.2d 876, 881 (2d Cir. 1980) (stating that "there are few, if any, issues in international law today on which opinion seems to be so united as the limitations on a state's power to torture persons held in its custody"); *see also Tel-Oren v. Libyan Arab Republic, supra*, at 781 (holding that the international law prohibition against torture is undisputed).

The prohibition against torture in international law "has been recognized so often and so widely that most scholars and practitioners consider it a principle of customary international law binding on all states." Stewart, *supra*, at 452. Indeed, it is this universal condemnation of torture, and corresponding efforts to protect individuals from such treatment, that led to passage of the Convention Against Torture. In its resolution of advice and consent to the treaty, the Senate indicated that "[t]he Convention codifies international law as it has evolved . . . on the subject of torture and takes a comprehensive approach to the problem of combating torture. . . . Ratification of the Convention Against Torture will demonstrate clearly and unequivocally U.S. opposition to torture and U.S. determination to take steps to eradicate it." Senate Report, *supra*, at 3.[11]

Even an express determination that Article 3 is not self-executing in the federal courts "does not detract from or modulate in any way the government's nonrefoulement obligation, nor does it diminish the absolute right of all individuals not to be returned to face torture." Elisa C. Massimino, *Relief from Deportation Under Article 3 of the United Nations Convention Against Torture, in* 2 1997-98 Immigration & Nationality Law Handbook at 467, 475, (American Immigration Lawyers Association ed., 1997); *see also* Stewart, *supra*, at 467-68 (stating that the "non-self-executing" declaration included by the Senate "concerns only the domestic effect of the

---

[11]Notably, the circumstances—Congress' enactment of a comprehensive scheme for the admission of refugees into this country—leading the Ninth Circuit to reject the argument that customary international law principles required the United States to provide "safe haven" on one who did not apply for or was ineligible for asylum do not exist here. *Galo-Garcia v INS*, 86 F.3d 916, 918 (9th Cir. 1996) (citing *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 939 (D.C. Cir. 1988); *Garcia-Mir v. Meese*, 788 F.2d 1446, 1453 (11th Cir.), *cert. denied sub nom. Ferrer-Mazorra v. Meese*, 479 U.S. 889 (1986).

Convention and does not limit or alter the extent of the United States's international obligations thereunder"). Denying individuals in deportation or removal proceedings an opportunity to invoke a substantive right to protection under Article 3, merely because there currently exists no legislation specifically implementing the provision, is a violation of the social and humanitarian objectives to which the United States has pledged its adherence, and is contrary to the other factors that suggest "the intention to establish direct, affirmative, and judicially enforceable rights." *Saipan v. United States Dep't of Interior, supra*, at 97.

As the United States' signing of the treaty acknowledges our agreement with its terms and our intention to adhere to its principles, there is no basis to prefer a reading that postpones the United States' obligation to act in accord with Articles 1-16, until such time legislation is enacted, over a reading of the declaration to mean simply that the relevant articles do not provide a federal cause of action, in which substantive rights might be pursued in a United States court. *See* Rosati, *Detailed Examination, supra*, at 7-8 (discussing that the latter reading would not preclude individuals in quasi-judicial deportation or removal proceedings from relying on the language of Article 3 for substantive rights of protection from removal). In sum, therefore, the majority's determination that Article 3 is non-self-executing, based merely on its analysis of the intent of one of the parties to the treaty expressed in an instrument of ratification, is an inadequate resolution of an extremely complex issue and results in the abrogation of our responsibilities under the treaty.

### B. Acknowledgment of Our Obligation to Act in Accordance with Article 3

According to the Senate, Article 3 is intended to "extend the prohibition on deportation under existing U.S. law to cases of torture not involving persecution on one of the listed impermissible grounds." Senate Report, *supra*, at 16. Although the Service did not submit a brief in this case, agency memoranda and public statements indicate that the Service recognizes the United States' clear obligation to comply with the dictates of Article 3. The agency has specifically addressed the circumstances in which the respondent finds himself, stating that "those individuals who do not qualify for asylum or withholding under U.S. law but for whom Article 3 of the Convention Against Torture [applies] may require a stay of removal." INS Memo, *supra*, at 2. Moreover, the Service has opined that

> as a provision in a treaty to which the United States is a party, Article 3 is United States law, equal in force to a federal statute. *See* Article VI, clause 2 of the U.S. Constitution. Such a non-self-executing treaty provision imposes on the United States "an international obligation to adjust its laws and institutions as may be necessary to give effect to the agreement." *See Restatement of the Law (Third) The Foreign Relations Law of*

> *the United States* § 111, comment h (1986), Thus, INS has a legal duty to ensure compliance with Article 3 in the cases of aliens it may remove from the United States.

*Id.*

Making a clear distinction between the Senate declaration that Articles 1-16 are not self-executing as only intended to prevent enforcement in the United States courts, the Service accepts unequivocally that we are obligated "to insure that the United States does not violate its duty under Article 3." INS memo, *supra,* at 3. The Service claims to be pursuing an informal process through which it has "evaluated cases involving our obligations under Article 3 since the United States became a party to the Convention Against Torture, and [has] arranged relief where appropriate." Letter from Doris Meissner, INS Commissioner, to Lawyer's Committee for Human Rights, (Feb. 7, 1997) (cited in Massimino, *supra*, at 476 n.19) ("Meissner letter").

In its announcement of regulations implementing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-207, 110 Stat. 3009-546 ("IIRIRA"), the Service included commentary recognizing that Article 3 "has been in effect since November 1994 . . . [and] the Attorney General has sufficient administrative authority to ensure that the United States observes the limitations on removal required by this provision." Rules and Regulations, 62 Fed. Reg. 10,312, 10,316 (1997). In addition, the Service has announced its intent to "carry out the non-refoulement provision of the Convention Against Torture through its existing administrative authority," 62 Fed. Reg. at 10,316, by granting stays of deportation "where appropriate." Meissner letter, *supra*.

Under its current administrative scheme, claims for relief under the Convention Against Torture are reviewed by the Service's Office of General Counsel. To raise a claim under the existing procedure, an alien seeking relief, or his or her counsel, should write to the INS district counsel with jurisdiction over the individual. A copy also should be sent to the General Counsel of the Service in Washington, D.C. The claimant should submit a detailed statement concerning why he or she will be tortured upon return and should provide any corroborating evidence demonstrating that he or she has been tortured or will be tortured, including documentation from human rights organizations. In addition, an explanation of the procedural posture of the case also should be provided. *See* Rosati, *Detailed Examination*, *supra*, at 5.

The Service has asserted that "[f]or the present," it "intends to continue to carry out the non-refoulement provision of the Convention Against Torture through its existing administrative authority rather than by promulgating regulations." 62 Fed. Reg. at 10,316. If the Service determines that a claimant may be eligible for relief under Article 3, it will agree to a stay of removal. However, no final relief will be provided until formal regula-

tions are promulgated. *See* Rosati, *Detailed Examination, supra*, at 5.

The Service's open and unequivocal admission of the obligations of the United States and the Department of Justice under Article 3 is of significant consequence in our review of the respondent's appeal. Ordinarily an express statement, such as that made by the Service, should establish a fact "'so that the one party need offer no evidence to prove it and the other is not allowed to disprove it.'" *Rarogal v. INS*, 42 F.3d 570, 572 (9th Cir. 1994) (quoting 9 John H. Wigmore, Evidence § 2588 (Chadbourn rev. 1981)). Rather than recognizing the Service's position concerning the force of Article 3 either as a binding admission of the Department of Justice's obligations under Article 3, or at a minimum, as the position of one party to the litigation before us, the majority utterly fails to address the implications of the Service's acknowledgment. *Cf. Rarogal v. INS, supra*, (finding that the Immigration Judge need not accede to the Service's position, but must provide reasons for reaching a conclusion contrary to the stipulated position of the parties). In my view, this failure seriously undermines the reasoning that underlies the majority's opinion.

## C. Administrative Scheme and "Appropriate and Necessary" Action

As a component of the executive branch of the United States Government, this Board is required to ensure compliance with the nation's undisputed obligations under international law. The momentary absence of specific regulations empowering the Board to exercise jurisdiction over Article 3 claims—particularly with regard to granting torture victims a permanent remedy or an affirmative status—is not a reason to shrink from our existing regulatory authority, or to ignore the mandates imposed by international law.[12] Rather, it requires us to devise a way within our existing authority, if possible, to respond to such claims in compliance with the United States' undisputed obligations under Article 3.

We have discretion and authority under 8 C.F.R. § 3.1(d) to take action that is "appropriate and necessary," to address these claims, at least in part. Deportation or removal proceedings before the Immigration Judges and the Board are an obvious forum for implementation of our obligation under Article 3[13]. I consider it well within the province of the Immigration Judges and the Board to conduct the fact-finding necessary to adjudicate the exis-

---

[12]As one Member of this Board has observed, in comments regarding the impact of the Refugee Convention and Protocol on our laws concerning refugees, "the forces which impel persons to seek refuge may be so overwhelming that the 'normal' immigration laws cannot be applied in their usual manner." *Matter of Pula*, 19 I&N Dec. 467, 476 (BIA 1987) (Heilman, concurring and dissenting).

[13]Initially, the Senate stated that the reference to "competent authorities" in Article 3 was to "the competent administrative authorities who make the determination whether to extra-

tence of a prima facie Article 3 claim, and, at a minimum, to refer meritorious claims to the Service. *See* 8 C.F.R. § 3.1(d); Kristen B. Rosati, *The United Nations Convention Against Torture: A Viable Alternative for Asylum Seekers*, 74 Interpreter Releases, No. 45, Nov. 21, 1997, at 1773, 1781.

Consequently, I believe it appropriate for an Immigration Judge or the Board to grant a continuance or to hold the case in abeyance, respectively, pending a remand to the Service with instructions to adjudicate the alien's Article 3 claim. Moreover, I consider it within the Board's "appropriate and necessary" authority that has been delegated to us by the Attorney General to review the Service's decision whether or not to stay deportation or removal.

In essence, a claim under the Convention Against Torture is much like a claim for withholding of deportation or removal fashioned in conformity with Article 33 of the Convention Relating to the Status of Refugees. The prohibited conduct—be it persecution or torture— must be assessed; the assessment is made based on the consideration of evidence pertaining to the individual's personal circumstances and the treatment he or she has experienced or fears, considered in light of reports of other governmental agencies, such as the Department of State and other international authorities; the assessment must distinguish treatment or conduct that is not subject to protection under the terms of the provision, such as that imposed by a state for legitimate reasons; and an ultimate determination must be made whether or not to afford protection under Article 3.

The Immigration Judges and the Board are uniquely qualified to conduct such evidentiary hearings and render such determinations. The Board has been the administrative body that has considered and reviewed withholding of deportation applications historically. We have exercised this jurisdiction to review and determine such claims before and since enactment of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102. We have reviewed the determinations of officials of the Service, prior to the existence of the Executive Office for Immigration Review in 1983, and the determinations made by Immigration Judges after 1983. *See, e.g., Matter of Janus and Janek*, 12 I&N Dec. 866 (BIA 1968); *see also, e.g.*, sections 208, 243(h) of the Act. Together with the Immigration Judges, we have contin-

---

dite, expel, or return," and recommended including in the ratification document a declaration that "the phrase, 'competent authorities,' as used in Article 3 of the Convention, refers to the Secretary of State in extradition cases and to *the Attorney General in deportation cases*." Senate Report, *supra*, at 17 (emphasis added), This declaration later was omitted, with the explanation that "[a]lthough it remains true that the competent authorities referred to in Article 3 would be the Secretary of State in extradition cases and *the Attorney General in deportation cases*, it is not necessary to include this declaration in the formal instrument of ratification." *Id.* at 37 (emphasis added).

ued to exercise jurisdiction over both asylum and withholding of deportation applications, notwithstanding the recent development of a corps of asylum officers within the Service. *See, e.g.,* 8 C.F.R. §§ 208.1, 208.2, 208.4(b)(4), 208.14 (1998); *see also* 8 C.F.R. §§ 242.11(c), 240.49(c) (1998).

The fact that the Service already may be engaging in such adjudications does not relieve us of our responsibility to review such claims within the existing scope of our regulatory authority. Notably, in the absence of additional regulations or legislation creating a specific remedy or form of relief apart from that existing in the present statute, the Service has no more authority than we do to taken action to prevent the deportation—or refoulement —of a victim of torture. The Service acknowledges that it is doing no more than granting stays of deportation in cases it finds to be meritorious. Likewise, we may decline to issue an order of deportation pending consideration of the respondent's claim under Article 3, or condition such an order so that deportation is not authorized to a country in which the respondent would face torture. Furthermore, the fact that the Service may be the party that physically executes the deportation order that we issue does favor leaving the ultimate nonrefoulement decision to the Service, either today or at some later time when regulations are promulgated or Congress enacts more specific implementing legislation.

When, as here, a respondent raises a colorable claim to protection under a treaty to which the United States is a party *and* under which it is obligated to act, *and* the Board has discretion and authority to act, dismissal of the respondent's claim by ordering him deported to Iran, the country in which he claims he will be tortured, is inappropriate. Neither the question of the enforceability of the respondent's claim in the federal courts, nor the fact that the Service may have acknowledged some obligation or responsibility to adhere to the terms of the treaty in question relieves us of our responsibility to address the case before us. The Board is obligated to endeavor to uphold the law of the land to the extent of our authority to do so. Consequently, I believe that, at a minimum, the Board should accept jurisdiction over the respondent's Article 3 claim, remand the record to the Service for adjudication according to its existing procedures with the recommendation that the Service stay his deportation to Iran, and reserve review of the decision made by the Service.